Filed 9/30/15 (Opinion on rehearing)

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059103 |
| v. | (Super.Ct.No. RIF10000395) |
| JAMES WILLIAM RILEY et al., | OPINION |
| Defendants and Appellants. | |


APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Affirmed in part; reversed in part.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant James William Riley.

Sarah A. Stockwell, under appointment by the Court of Appeal, for Defendant and Appellant Ryan Jay Robinson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette

1

Cavalier and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants James William Riley and Ryan Jay Robinson appeal their convictions on three counts each of commercial bribery, in violation of Penal Code section 641.3, subdivision (a).[1] The charges are based on the premise that Riley, who was the insurance broker for Pechanga Resort and Casino, paid bribes to Robinson, who was the chief financial officer of the casino, in order to permit Riley to charge excessive fees for insurance products he obtained for the casino.

On appeal, defendants assert that there is insufficient evidence that they acted "corruptly," i.e., with the specific intent to injure or defraud Robinson's employer, as required by the statute. (§ 641.3, subds. (a), (d)(3).) They also assert, in response to our request for supplemental briefing, that there is insufficient evidence to support their convictions on two of the counts against each of them because the evidence showed that as of the date of those charged offenses, Robinson was no longer employed by Pechanga Resort and Casino.

We conclude that the evidence that Robinson was not employed by Pechanaga Resort and Casino as of the dates alleged in counts 6 through 9 compels reversal of the defendants' convictions on those counts. However, we also conclude that there is substantial evidence to support their convictions on counts 4 and 5.

---

[1] All further statutory citations refer to the Penal Code.

2

PROCEDURAL HISTORY

The grand jury indicted Riley and Robinson on three counts of grand theft (§ 487, subd. (a); counts 1-3) from Pechanga Resort and Casino, and indicted each of them on three counts of commercial bribery (§ 641.3, subd. (a); counts 4, 6, 8 (Riley) and 5, 7, 9 (Robinson)).  As to each count of commercial bribery, the indictment alleged that the bribe paid or accepted was in excess of $1,000.  The grand jury also indicted Riley on three counts of money laundering.  (§ 186.10, subd. (a); counts 10-12.)  The indictment alleged that in count 12, the transaction exceeded $50,000, within the meaning of section 186.10, subdivision (c)(1)(A), and alleged that both defendants committed two or more related felonies involving embezzlement as a material element and that the pattern of felonies involved the taking of more than $500,000, within the meaning of section 186.11, subdivision (a)(2).

At defendants' first trial, counts 2 and 3 were submitted to the jury only as to Riley.  The jury was unable to return a verdict as to any count of the indictment.  Upon motion by the defendants, the trial court dismissed counts 1 through 3 and 10 through 12, as well as the special allegations related to those counts, in the interest of justice.  The court cited insufficient evidence to support a finding of guilt beyond a reasonable doubt.  The court set the remaining counts for retrial.

Following a second trial, Riley was found guilty on counts 4, 6 and 8, and Robinson was found guilty on counts 5, 7 and 9.  The jury found true the allegations that each count involved a bribe in excess of $1,000.  As to Riley, the court imposed the lower

3

term of one year four months on count 4 with consecutive terms of eight months on counts 6 and 8, and imposed associated fines and fees. As to Robinson, the court imposed the lower term of one year four months on count 5 with consecutive terms of eight months on counts 7 and 9, and imposed associated fines and fees. Each defendant filed a timely notice of appeal.

STATEMENT OF FACTS

Defendant James Riley had been a licensed commercial insurance broker since 1989. In 1996, while working for a firm called Austin Cooper and Price, he obtained the account of Pechanga Development Corporation (PDC).[2] He took the account with him when he left that firm and went to work for Dodge Warren and Peters. In 2002, he left Dodge Warren and Peters and opened his own firm, Riley Garrison and Associates (RGA). At that point, Riley was designated broker of record by Anthony Miranda, the PDC board member responsible for insurance matters. Miranda and Riley had known each other since junior high school, but Riley did not know that Miranda worked for PDC

---

[2] Pechanga Resort and Casino is operated by Pechanga Development Corporation, or PDC. PDC is one of three "entities" which are the operating constituents of the Pechanga tribe (officially named the Pechanga Band of Luiseño Indians; see <http://www.pechanga-nsn.gov> [as of Sept. 30, 2015]). PDC operates all business operations of the tribe. A second entity is the tribal government. That entity operates in effect as a city council for the tribal reservation. A third entity is the Pechanga Gaming Commission, which oversees gaming compliance at the casino. The three entities are separate from one another, and employees of one entity are not employees of either of the other two. (We discuss this in greater detail elsewhere in this opinion.)

The focus in this case was on insurance transactions for the casino, to which the parties frequently referred simply as "Pechanga."

4

when he first sought the account in 1996.[3]  Although he initially dealt with Miranda and the board on PDC insurance matters, after 2001 or 2002, he dealt with Robinson.

Approximately four years after Riley obtained the account, Robinson became the chief financial officer (CFO) for Pechanga Resort and Casino.  (Hereafter sometimes referred to as the casino.)  As CFO, Robinson was responsible for insurance for the casino.  Robinson had worked for the casino for several years before he became CFO and, during that time, he and Riley had become friends.

On a number of occasions, beginning in April 2005, Riley gave Robinson large sums of money in the form of cashier's checks.  Riley transferred the money from RGA's operating account into his personal savings account and then obtained the cashier's checks.  Riley testified that the payments were personal loans or gifts motivated solely by friendship and, in one instance, an investment in a business Robinson was involved with, unrelated to Pechanga.  He denied that the payments were related to or intended to influence Robinson with respect to Pechanga's insurance.

The first such payment took place in April 2005.  This incident was not one of the charged offenses, but was offered to show the beginning of the pattern of activity.  On April 28, 2005, $55,000 was deposited into Riley's personal savings account.  On that same date, $55,000 was withdrawn from the account and a cashier's check in the amount

---

[3]  Although the parties and the witnesses sometimes referred to Riley's relationship with Miranda, there is no evidence that Miranda had any involvement in the events which are the subject of the prosecution.  Miranda did not testify at the trial.

5

of $40,000 was issued to Robinson, who negotiated the check. On March 24, 2005, Pechanga had issued a check in the amount of $869,942.28, to Riley's firm (RGA) as the down payment on a contract to finance several insurance policies. (Financing of large commercial insurance premiums is a common practice.) The financing agreement, which was actually issued on March 31, 2005, showed a total premium for three policies and did not reflect any broker's fees. A revised financing agreement for the same three policies, issued April 29, 2005, showed the same total premium as the March 31, 2005 agreement. However, the premiums charged by two of the three insurance companies were reduced by a total of $1,441,000, but the financing agreement showed a broker's fee of $1,441,000.[4] In addition, the financing agreement showed a broker's fee in the amount of $538,200 on other policies being financed under the same agreement, in addition to the commission which was shown on the policies themselves. A forensic accountant who

---

[4] It is a common practice in the industry to charge a broker's fee in lieu of a commission or in addition to a commission. A broker will commonly charge a fee if the policy does not carry a commission or if he or she determines that the commission is inadequate to provide a reasonable profit. The parties stipulated that the Insurance Code does not limit the amount of fees and/or commissions relating to commercial insurance policies and that it does not require a broker to disclose fees or commissions relating to commercial insurance policies.

6

testified for the prosecution stated that the total fees and commissions paid to RGA on this group of policies amounted to approximately 24.5 percent of the premiums.[5]

On March 30, 2006, RGA invoiced Pechanga for a deposit on the April 1 renewal of a policy issued by Hudson Insurance Company. The invoice was for $1,682,148.45. The financing agreement dated March 31, 2006, showed that the down payment was to be $1,091,606.45. The total premium on the policy was $8,200,000. On a revised financing agreement for the same policy, dated April 6, 2006, the policy premium was shown as $7,380,000, a difference of $820,000. On the April 6 financing agreement, the fee charged by RGA was increased by that amount over the March 31 financing agreement.[6] On April 27, 2006, Riley transferred $60,000 from the RGA operating account into his savings account. On that same date, he used funds from his savings account to issue a

---

[5] The witness based his calculations on net premium, i.e., the gross premium less the commissions and fees. He acknowledged that testimony from experts in the insurance industry (called by the prosecution) had established that the compensation is based on the gross premium. Based on the total dollar sales, however, RGA's profit on the Pechanga account in 2006 was 20.8 percent. Jerry Konchar, the CFO of PDC, testified that the brokers PDC now uses charge commissions ranging from 15 to 20 percent.

[6] RGA did not provide financing. Financing was provided by First Insurance Funding Corporation (FIFC). FIFC was not involved in negotiating premiums or broker fees. It is standard in the industry that a broker or agent could add a percentage to the finance rate, called a "bump." This is typically not disclosed on the financing agreement. Other fees imposed by the broker may "exist outside the scope of the financing agreement," i.e., paid separately by the insured and not financed, or financed in part. It is typical for a broker to include at least a portion of the fee in the deposit.

7

cashier's check to Robinson in the amount of $50,000. The check was deposited to Robinson's bank account.

On June 8, 2006, a financing agreement from FIFC required a renewal down payment in the amount of $167,926.20. The balance of the premium was $1,511,335.80. RGA invoiced Pechanga for $367,926.20 for the renewal down payment. On July 11, 2006, $50,000 was transferred from RGA's general account into Riley's savings account. On that same date, Riley withdrew $20,000 from his savings account and obtained a cashier's check in that amount, payable to Robinson. Robinson deposited the check into his bank account.

On July 28, 2006, FIFC issued a financing agreement for premiums totaling $11,600,000. The agreement required a cash down payment in the amount of $1,160,000. Pechanga paid RGA's invoice for $1,160,000 for the down payment on August 22, 2006.

On August 16, 2006, $100,000 was deposited to Riley's savings account. On that same date, $80,000 was withdrawn from the account, and four cashier's checks, each in the amount of $20,000, were made payable to Robinson. All were deposited into Robinson's bank account.

The $11.6 million transaction in July and August 2006 ultimately lead to the discovery of the outside financial dealings between Riley and Robinson. That transaction was for obtaining additional "difference in conditions" (DIC) insurance, which covered property losses from earthquake and flood. Pechanga's DIC policy ran from April to

April. In insurance years 2005-2006, Pechanga carried approximately $1.2 billion dollars in DIC insurance. In 2006, the availability of such insurance became severely limited as a result of Hurricane Katrina,[7] and premiums had greatly increased. In April 2006, Riley was able to obtain only $380 million in DIC coverage, for which the casino paid approximately $8.7 million. In July 2006, Nancy Veeh, one of the wholesale insurance brokers Riley used to procure DIC insurance for Pechanga, alerted him that some additional coverage might be available.[8] She told him that because of the highly competitive market, he would need to obtain a firm commitment from the casino for the projected cost of the insurance, which she placed at approximately $9,817,222 for the premium alone, exclusive of any fees the various brokers involved in the transaction would impose. The transaction involved three layers of coverage from three carriers. The largest layer, which was projected to cost $7.25 million, did not carry a commission.

---

[7] Hurricane Katrina made landfall in Louisiana and Mississippi on August 29, 2005. (See <http://www.cnn.com/2013/08/23/us/hurricane-katrina-statistics-fast-facts> [as of Sept. 30, 2015].)

[8] Wholesale brokers have access to certain types of insurance to which retail brokers such as Riley do not. DIC insurance is one of them. Two commercial brokers who were involved in obtaining DIC insurance for the Pechanga casino testified that in any year, there is only a certain amount of DIC insurance available for tribal casinos on the world market. In 2005-2006, there was far less coverage available than in prior years because of the tremendous losses caused by Hurricane Katrina.

Robinson approved the purchase of the additional DIC coverage and signed the financing agreement for $11.6 million for the package of coverage, which would bring the total DIC coverage up to $700,000,000.

By the time this transaction took place, Robinson was no longer Pechanga's CFO. In May 2006, Robinson had been hired by the Pechanga Tribal Government as its CFO. Jerry Konchar, the CFO of PDC, took over as interim CFO of the casino until a permanent replacement could be hired. Robinson told Konchar he was going to continue to handle the casino's insurance, and Konchar apparently agreed to this because he was immersed in an annual audit, which needed to be completed and a report filed with the NIGC, or National Indian Gaming Commission.[9] The report was late, and completing the audit was Konchar's priority.

The invoice for the premium financing the down payment for the DIC insurance was sent to Robinson. The down payment was $1.16 million. Robinson issued a check request, which was eventually forwarded to Konchar, along with the invoice. Konchar had previously signed off on a check request issued by Robinson for an insurance policy renewal in the amount of approximately $12,500, which he did not question, but he was unwilling to sign off on the request for $1.16 million. Konchar was familiar with property insurance in general, but not with DIC insurance, and he did not understand why it was so expensive. There was no insurance information in Robinson's office, so

---

[9] See <http://www.nigc.gov> (as of Sept. 30, 2015).

Konchar was unable to determine the basis for the $1.16 million down payment. Konchar testified that he did not understand why the cost of the DIC insurance had more than doubled from April 2006 to August 2006. In meetings and via emails to Konchar, Riley and Robinson explained the reasons that the DIC premium was so high.[10] Nevertheless, Konchar and Robinson's permanent successor, Tjeerd Brink, apparently remained skeptical, and an investigation ensued.[11]

Ironically, Riley was able to obtain more DIC insurance in 2006 for the Pechanga casino than almost any of the other tribal casinos in California, and at lower cost per million than most. Accordingly, despite Konchar and Brink's suspicions, there was in fact nothing untoward about the July 2006 transaction involving DIC insurance except,

---

[10] Konchar testified that before a meeting with Riley and Robinson on August 22, 2006, Robinson never provided him with any information about the DIC insurance, other than the invoice and an amortization schedule, and that even at the meeting Riley did not provide much information. On cross-examination, however, it became clear that Robinson and Riley had in fact provided him with a great deal of information, including an email from Nancy Veeh which explained the issues concerning DIC coverage in the aftermath of Hurricane Katrina. Ron Randazzo, the casino risk manager, told Konchar that based on the information they had received, he believed that Robinson was correct that it was in the casino's best interest to obtain as much DIC insurance as it could. Konchar ultimately authorized the payment of the $1.16 million down payment because he did not want the casino to be in default on the loan.

[11] Konchar also described several subsequent insurance transactions with Riley, which ultimately led PDC to terminate his services.

11

arguably, the size of Riley's fee.**12**  Neither Konchar nor Brink, however, ever asked

Riley how much of the cost of the DIC insurance consisted of his fees or commissions.

The evidence showed that between 2003 and 2006, Robinson made large

payments to Thomas LaValle, in connection with gambling activities and some stock

purchases.  Robinson also lent money to LaValle.  Riley testified that Robinson also had

large expenses resulting from a divorce.

LEGAL ANALYSIS

1.

THE PROSECUTION DID NOT MEET ITS BURDEN OF PROOF

WITH RESPECT TO COUNTS 6 THROUGH 9

Section 641.3 provides in relevant part, "Any *employee* who solicits, accepts, or

agrees to accept money or any thing of value from a person other than his or her

employer, other than in trust for the employer, corruptly and without the knowledge or

consent of the employer, in return for using or agreeing to use his or her position for the

benefit of that other person, and any person who offers or gives an *employee* money or

any thing of value under those circumstances, is guilty of commercial bribery."  (Pen.

Code, § 641.3, subd. (a), italics added.)

---

**12**  Riley's fee on the August 2006 DIC transaction was apparently $2,282,567.
This figure is the difference between the $11.6 million Robinson committed to and the
actual premium, which ultimately turned out to be $9,317,433.  Riley admitted that he
used the difference as his fee.

12

In this case, the indictment specifies three dates upon which alleged acts of commercial bribery took place:  on or about April 27, 2006 (count 4 as to defendant Riley and count 5 as to defendant Robinson); on or about July 11, 2006 (count 6 as to defendant Riley and count 7 as to defendant Robinson); and on or about August 16, 2006 (count 8 as to defendant Riley and count 9 as to defendant Robinson).  Each count alleges that Robinson was on the specified date an employee of Pechanga Resort and Casino.  At trial, however, it was undisputed that Robinson left his job with Pechanga Resort and Casino on or before May 22, 2006, and had become the chief financial officer for the Pechanga tribal government.  We asked the parties to provide supplemental briefing addressing the question of whether this evidence affects the validity of defendants' convictions on counts 6 through 9.

In her supplemental brief, the Attorney General asserts that the record shows that Robinson was an employee of "Pechanga" throughout the entire period alleged in the indictment, apparently referring to the Pechanga tribe.  She notes that Konchar testified, "[W]e all work for the Tribe."  The indictment did not allege that Robinson was an employee of the Pechanga tribe, however; it alleged that he was an employee of Pechanga Resort and Casino.  Even if it is true that employees of the casino and of the tribal government do ultimately work "for the Tribe," it is also true that not all employees of the tribe work for the casino.  Konchar testified that the Pechanga tribal government was an entirely separate entity from Pechanga Resort and Casino.  He described each as an "entity" of the Pechanga tribe, but testified that each had its own physical location and

13

operating structure, and that Robinson's new position as CFO of the tribal government was not a transfer but a new job. He specifically stated that as of May 22, 2006, Robinson "was no longer an employee of the casino." Tjeerd Brink, who became the permanent CFO of the casino after Robinson moved to the tribal government, also testified that working for the tribal government is considered "a complete and separate employment from the Pechanga Resort and Casino." There was no contrary evidence. Accordingly, the undisputed evidence shows that Robinson's change in employment was not an internal transfer within a single organization but rather a new job for a separate legal entity.

The Attorney General also argues that the conclusion that Robinson was "a Pechanga employee" throughout the relevant period is supported by the evidence that even after changing jobs, "Robinson still handled the purchase of property and casualty insurance for the Resort and Casino." She implies that doing so was still Robinson's job. However, at trial, the prosecutor used the fact that Robinson did *not* work for the casino when he had insurance invoices sent to him at the tribal government office and persuaded Konchar to approve them as evidence that Robinson was improperly exercising his influence to ensure that Riley's allegedly inflated fees and commissions would be paid, even though he had no authority to sign off on insurance for the casino or to approve payment for the casino's insurance. Even if it is true that Robinson was trying to induce Konchar to approve payment of the invoice for DIC insurance for a wrongful purpose— as opposed to attempting to ensure that the casino had an adequate amount of DIC

14

insurance—however, it was undisputed that Robinson was not an employee of the casino at that time.

The prosecution has the burden of proving every element of a charged offense beyond a reasonable doubt. (*People v. Neidinger* (2006) 40 Cal.4th 67, 72.) An element of the offense of commercial bribery is that one of the parties to the illicit transaction must be an employee of the entity alleged to have been injured by the transaction. (§ 641.3, subd. (a).) Here, there is no evidence that Robinson was an employee of Pechanga Resort and Casino as of the dates alleged in counts 6 through 9, as required by section 641.3. Accordingly, the convictions on those counts must be reversed.

2.

SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICTS

Defendants contend that there was insufficient evidence to support the verdicts because (1) there was no evidence that any payment from Riley to Robinson was related to any specific insurance transaction, and (2) there was no substantial evidence that the defendants acted with the specific intent to injure or defraud Pechanga.

Underlying defendants' first contention is the assumption that section 641.3 requires evidence of a direct relationship between each bribe and a specific benefit conferred. This is a question not of the sufficiency of the evidence, but of statutory interpretation, i.e., whether the statute requires evidence of a direct quid pro quo. The meaning of a statute is a question of law which we decide de novo. (*People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432.)

15

If statutory language is unambiguous, the plain meaning controls. (*People v. Dunbar* (2012) 209 Cal.App.4th 114, 117.) There is nothing in the unambiguous language of section 641.3 that supports the conclusion that a direct quid pro quo is required. Rather, the statute requires proof that a bribe was offered and accepted or solicited and given with the specific intent to injure or defraud the employer. (§ 641.3, subds. (a), (d).)[13] It does not require proof that a particular payment was tied to a particular act.

---

[13] In pertinent, part, section 641.3 provides:

"(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery. [¶] . . . [¶]

"(d) For purposes of this section: [¶] . . . [¶]

"(3) "Corruptly" means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer."

With respect to their second argument, defendants rely on the absence of evidence that the casino suffered any economic injury as a result of their activities as demonstrating that they did not act with the specific intent to injure it. To the extent that this argument rests on the premise that proof of injury is required, it is fallacious; section 641.3 does not require proof that injury resulted from the bribery. Moreover, section 641.3 does not necessarily require proof of intent to injure. Rather, section 641.3 states its specific intent requirement in the alternative: to injure *or* defraud the employer or a competitor of the employer. (§ 641.3, subd. (d)(3).) An intent to defraud is an intent to deceive another person for the purpose of gaining a material advantage over that person or to induce that person to part with property or alter that person's position by some false statement, false representation of fact, wrongful concealment or suppression of the truth, or by any artifice or act designed to deceive. (*People v. Pugh* (2002) 104 Cal.App.4th 66, 72.) It is also the intent to obtain something of value by means of a "dishonest stratagem." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 279.) As we discuss *post*, there is substantial evidence that Riley and Robinson engaged in such a stratagem.

In reviewing a claim of insufficient evidence, we review the entire record to determine whether it contains substantial evidence to support the judgment or finding in question. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) We review the evidence "'in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Id*. at p. 576.) Substantial evidence is evidence that is reasonable, credible and of solid value,

17

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid*.) We do not reweigh the evidence or resolve credibility issues or conflicts in the evidence; those functions are reserved for the trier of fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Here, there is substantial evidence that in return for the numerous payments he received from Riley, Robinson exercised no oversight over the fees Riley charged. The evidence showed that in one instance, Riley obtained a lower premium on a policy than he had originally quoted to the casino, but that instead of giving the casino the benefit of the reduction, he merely added the difference to his own fee. There is no evidence that the additional fee was justified by any additional work performed by Riley to obtain the lower premium. And, there is evidence that in at least one instance, Riley charged what would appear to be an unconscionable fee: Riley charged a fee of $1,055,000 on a premium of $1,105,000. When the amount of the fee was questioned by one of his

employees, Riley replied that the client was "helping us get our agency started."**14**  There

was no evidence that in either instance, or in any other instance, Robinson ever objected

to Riley's fee or commission or sought to negotiate a more favorable deal for the casino.

Rational jurors could infer from that evidence that Riley was bribing Robinson not to

---

**14** In their petitions for rehearing, both defendants challenged our reliance on this evidence.  Robinson's attorney stated his belief that the invoice reflecting this transaction was for a self-insured workers' compensation program made available exclusively to Indian casinos.  A prosecution witness testified that Pechanga saved a very substantial amount of money under that program, and that the program required a great deal of administrative work by RGA, for which no commission was paid.  Robinson argued that RGA was justified in charging a substantial agency fee reflecting the amount of work involved.  Riley argued that the exhibit does not support our interpretation of it.

We granted rehearing and also granted Riley's motion for late transmission of exhibits.  Having reviewed the pertinent exhibit, we reject Robinson's contention. Neither the exhibit nor any other portion of the record Robinson cited establishes that the invoice was related to the workers' compensation program.  Nor, we should point out, is there any evidence that a fee of over one million dollars would have been justified by the amount of work RGA performed in administering that program.

We also reject Riley's argument that the exhibit merely shows the broker fee paid to Affinity Insurance and the agency fee paid to RGA and does not also reflect the premium paid by Pechanga.  The exhibit states a "package renewal" in the amount of $1,105,000, a broker fee to Affinity Insurance in the amount of $50,000, and an agency fee to RGA in the amount of $1,055,000, with a total of $2,210,000 billed to Pechanga. On its face, the invoice rationally supports the conclusion stated *ante*.

Robinson also complains that this invoice reflects a transaction in 2004, which is two years earlier than the offense charged in counts 4 and 5 of the indictment.  However, neither party disputes the sufficiency of the evidence that Riley made a payment to Robinson on or about April 27, 2006, which is the act alleged in counts 4 and 5.  The undisputed evidence showed that on that date, Riley paid Robinson $60,000.  As we have discussed *ante*, the prosecution did not have the burden of proving that in return for the amount Robinson provided a direct benefit to Riley.  The evidence that Riley and Robinson engaged in a course of conduct over several years in which bribes were paid and benefits accrued to Riley is sufficient to satisfy the requirements of section 641.3, as long as there is evidence that they acted with the necessary intent.

scrutinize his fees and commissions, and that Robinson placed his own financial interests above those of his employer. That conclusion is further supported by the evidence that Robinson used some of the money Riley gave him either to gamble or to pay off gambling debts, and that Robinson had significant expenses in connection with a divorce. This is a "dishonest stratagem" designed to enrich both Riley and Robinson, potentially at the expense of Pechanga. At the very least, their stratagem deprived Pechanga of the opportunity to seek a better deal on its insurance.

Riley contends that Robinson cannot be faulted for his lack of scrutiny because both Konchar and Brink testified that they did not ask Riley to break out his fees from the gross premium, and Robinson merely acted in the same manner. However, the issue is not whether Robinson was negligent but whether the evidence supports the conclusion that Robinson was intentionally allowing Riley to charge whatever fees he chose rather than protecting his employer's interests. Rational jurors could determine that the evidence does support that conclusion.

Defendants also contend that as long as the casino received the "full benefit of a market value bargain," there is no basis for finding them guilty of commercial bribery. They point out that the casino received the insurance it needed, sometimes at a lower rate than other casinos were able to obtain, and that the casino was never billed for insurance it did not receive. They also contend that Riley always charged fees and commissions

that were within the standards of the industry.  Even if this is true, however, it is not dispositive.[15]  Section 641.3 does not require proof that the employer was injured by the bribery.  Accordingly, although absence of injury may be a circumstance that persuades jurors a defendant did not act with the specific intent to injure or defraud, it does not compel a not guilty verdict.[16]

---

[15]  We have not found any evidence that established what the industry standard is. The sole instance of testimony on that point that we could find in the record was stricken by the trial court following an objection based on lack of foundation.  However, the evidence showed that RGA's overall profit from the Pechanga account was 20.8 percent. Based on Konchar's testimony that Pechanga's current brokers charge between 15 and 20 percent fees and commissions (see fn. 5, *ante*), RGA's profit might indeed have been only slightly above industry norms.

[16]  *CrossTalk Productions*, *Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644 (*CrossTalk*) on which defendants rely to assert that the "full benefit of a market value bargain" formulation is the definition of injury under section 641.3, does not so hold.  In that case, the court held that a demurrer was properly sustained because the allegations of the complaint did not compel the conclusion the plaintiffs had committed commercial bribery; the facts alleged did not establish that they necessarily intended to injure or defraud anyone, because "[t]he complaint does not necessarily demonstrate any intent on the part of plaintiffs that CBS not receive the full benefit of a market value bargain *or that plaintiffs obtained a contract improperly*." (*CrossTalk Productions*, *Inc. v. Jacobson*, at pp. 643-644, italics added.)  The court did not hold that "full benefit of a market value bargain" is the sole formulation of injury under section 641.3, and it also recognized that intent to injure is not the sole intent that can satisfy the requirements of section 641.3.

Defendants urge us to consider all of the favorable evidence and the weaknesses in the prosecution's case in determining whether there truly is substantial evidence of specific intent to injure or defraud the casino. Even if we view the evidence in the light most favorable to defendants—which is the opposite of the standard we actually apply (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576)—however, we can at most say that reasonable minds could differ as to whether the prosecution convincingly demonstrated that defendants acted with the necessary specific intent. If our review of the record shows that there is substantial evidence to support the judgment, we must affirm, even if there is also substantial evidence to support a contrary conclusion and the jury might have reached a different result if it had believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) Accordingly, if the evidence is such that rational people could reach conflicting conclusions, there is by definition substantial evidence to support the judgment. As we have discussed *ante*, substantial evidence supports the verdict. It is irrelevant that another jury might have entertained doubt as to their guilt.

DISPOSITION

The convictions on counts 6, 7, 8 and 9 are reversed for insufficient evidence. The trial court is directed to enter a judgment of acquittal on those counts and to issue amended abstracts of judgment and sentencing minutes, and to provide certified copies of the amended documents to the Department of Rehabilitation and Correction and to the parties. The judgment is otherwise affirmed.

CERTIFIED FOR PUBLICATION


McKINSTER         <br>J.

We concur:


RAMIREZ      
      P. J.


KING        
     J.