Filed 2/8/24  P. v. Dominguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTY R. DOMINGUEZ,<br><br>    Defendant and Appellant. | D081066<br><br><br>(Super. Ct. No. CR105918) |

APPEAL from an order of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley, Alan L. Amann, and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Marty R. Dominguez appeals from an order denying his Penal Code section 1172.6 petition to vacate and be resentenced on a 1990 conviction for second degree murder.[1]  Following an evidentiary hearing, the trial court found, beyond a reasonable doubt, that Dominguez directly aided and abetted a fatal shooting with implied malice, in significant part because he knew the shooter was armed and gave the shooter explicit instructions to shoot at the victim.  As a result, the court denied his petition.

Dominguez contends we should reverse.  He initially argued the denial of his petition was error because direct aiding and abetting an implied malice murder is an invalid theory of liability following legislative changes to the murder laws.  Dominguez acknowledges this argument is now foreclosed by *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), in which the California Supreme Court affirmed the validity of a direct aiding and abetting theory of implied malice murder.  Dominguez refocuses on his contention there was insufficient evidence to support the trial court's finding he acted with implied malice.  We affirm.

---

[1]    All further undesignated statutory references are to the Penal Code. The relevant procedural provision was originally codified as section 1170.95 but was later amended and renumbered as section 1172.6, without substantive change.  (Stats. 2021, ch. 551, § 1, subd. (b) [amended]; Stats. 2022, ch. 58, § 10 [renumbered].)  Although Dominguez filed his petition pursuant to former section 1170.95, we refer to the statute by its current designation for simplicity.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Dominguez's Section 1172.6 Petition*

In 1990, a jury convicted Dominguez of second degree murder (§ 187) for his role in the shooting death of Paul Mallory and found true an allegation he was armed with a firearm during the commission of the offense (§ 12022, subd. (a)).  The trial court sentenced Dominguez to prison for 21 years to life. Dominguez appealed and we affirmed the judgment in an unpublished opinion, *People v. Dominguez*, December 16, 1991, D012153 (*Dominguez I*).)

In January 2019, Dominguez filed a petition for resentencing under section 1172.6.  In July 2020, the trial court found Dominguez had not made a prima facie showing he was entitled to relief and denied the petition. Dominguez appealed and we affirmed.  In our original opinion, *People v. Dominguez* (2021) 70 Cal.App.5th 413, we concluded the trial court properly considered the record of conviction to determine as a matter of law that Dominguez is ineligible for relief.

The California Supreme Court then granted Dominguez's petition for review and transferred the matter to this court with directions to vacate our prior opinion in light of newly enacted Senate Bill No. 775 (Stats. 2021, ch. 551) (Senate Bill 775), which became effective January 1, 2022.

We requested and received supplemental briefing from the parties on the impact of Senate Bill 775.  The Attorney General conceded the order denying the petition must be reversed and the matter remanded to the trial court with directions to issue an order to show cause and conduct an evidentiary hearing.  We accepted the concession, reversed and remanded to the trial court to hold an evidentiary hearing to determine whether

3

Dominguez was entitled to relief under section 1172.6. (*People v. Dominguez* (Mar. 8, 2022, D077859) [nonpub. opn.] (*Dominguez II*).)

## II.

### *The Evidentiary Hearing*

The trial court conducted an evidentiary hearing on September 22, 2022. The prosecution submitted the trial record from Dominguez's 1990 jury trial.[2] No other evidence was offered by either the prosecution or Dominguez. The following summary of facts is taken from the reporter's transcript of the jury trial.

A.    *Prosecution's Case*

On the evening of June 9, 1989, Mallory, Mallory's brother, and their friend E.W., walked along a street towards their shared home. A car drove by the group and someone from the car yelled out at them. Mallory responded, "What's up brother," and his brother responded, "What's up." The car then made a U-turn.

The car was driven by Dominguez's girlfriend, Debra Garcia. Dominguez was in the front passenger seat, and two men sat in the backseat. Dominguez exited the car, approached E.W., and told him, "This is my neighborhood. You can't be saying that to me—to us."

Mallory then told Dominguez, "Fuck you, Mexicans. You can't tell me how to talk." Meanwhile, one of the men from the backseat of Garcia's car, wearing black, exited the car holding a gun. The man pointed the gun at Mallory and pulled the trigger, but the gun would not fire. The gunman pulled the slide back on the gun, appearing ready to shoot again. But

---

[2]    We granted Dominguez's unopposed requests for judicial notice of our files and records filed in both of his prior appeals, *Dominguez I* and *II*, which contained the trial record.

4

Dominguez stopped him, saying "Don't shoot, don't shoot without a reason," and pushed him back into the car. The man complied and got back into Garcia's car, next to a mean wearing a tan jacket.

E.W. then told Dominguez, "we stay right around the corner from each other and we stay in the same neighborhood. We shouldn't be fighting." E.W. and Dominguez shook hands and Dominguez got back into Garcia's car. But before returning to the car, Dominguez told Mallory, "I'll deal with you another day."

Garcia drove her car away as Mallory's group, joined by his other brother, continued to walk down the street. As they reached a street corner, E.W. saw that Garcia's car was parked. He observed Dominguez and a man in a tan jacket who had been in the backseat of Garcia's car run from around another parked car. Dominguez and the man stopped at the corner across the street from Mallory's group, around 40 to 50 feet away. Dominguez said to Mallory's group, "Yo, vatos, do you want to finish that now?"

Dominguez then told his companion in the tan jacket, "Start shooting" or "Shoot, go ahead, shoot." The man pulled a gun from under his jacket, aimed the gun at Mallory's group, and fired approximately seven shots. Dominguez stood next to the shooter as the shooter fired at Mallory and his group. Dominguez fled with the shooter to Garcia's awaiting car.

E.W. was shot once in the hand, and Mallory was shot three times. Mallory died at the scene as a result of a gunshot wound to his chest. Officers found eight spent casings at the scene of the shooting, and a firearms examiner determined seven of the casings had been fired from the same gun.

B.     *Defense Case*

Dominguez testified that, on the evening of the shooting, he and Garcia left their home at around 10:30 p.m. to go to the store. Before they got into

5

the car, two men whom Dominguez recognized from his neighborhood approached him and asked for a ride. One of the men told Dominguez he had been having trouble with some men in the neighborhood. Dominguez agreed to give the men a ride and they got into the backseat of Garcia's car.

As Garcia drove by Mallory and his group, Garcia made a U-turn because Dominguez wanted to talk to them. When Dominguez got out of the car, Mallory started swearing at him. E.W. and Dominguez, however, were friendly with each other and they shook hands.

One of the men from the backseat tried to get out of Garcia's car, but Dominguez told him to get back in. As he spoke with E.W., no one got out of the car and Dominguez did not see anyone with a gun. Dominguez was familiar with the sound of a gun trigger, but claimed he never heard the click of a trigger or the sound of a firearm "slide being pulled back" that evening.

Dominguez then got back into Garcia's car and she drove away. One of the men asked Garcia to be let out of the car and she pulled over. Dominguez got out the front seat to let both men out of the backseat of the car. As he got back in the car, Dominguez heard approximately 10 gunshots. The two men who had been in the backseat of the car fled on foot. He and Garcia drove away. Dominguez testified he was not present when Mallory was shot and he did not see or know who shot Mallory.

C.    *The Trial Court's Ruling*

The trial court stated it had reviewed Dominguez's section 1172.6 petition and the record of the original trial proceedings, and then permitted the parties to argue their positions.

Defense counsel asserted there was insufficient evidence that Dominguez aided and abetted the murder of Mallory "in a meaningful way." Counsel argued the testimony of witnesses at trial "varied" and were

6

"inconsistent," contending that Mallory "remained aggressive and that this was a fight that never really seemed to come to any type of conclusion." Counsel also stated that Dominguez disputes the evidence established "he somehow ordered the actual shooter . . . to fire the weapon." Relying on the probation report, defense counsel argued the court should consider Dominguez's age as a "youthful offender" and his history of addiction and "instability" in evaluating his mental state.[3]

In response to defense counsel's argument, the trial court asked counsel: "If in fact [Dominguez] said 'Go ahead and shoot,' then that certainly would weigh in favor of finding that he was a direct aider and abettor; correct?" . . . [¶] Because he would be encouraging the shooting." Counsel conceded: "He would be facilitating or aiding in the commission" of the shooting. Counsel reiterated, though, that the court should consider that "there were some significant variance amongst the witnesses and the timing

---

[3]     "Ordinarily, a probation officer's report is not part of the record of conviction." (*People v. Del Rio* (2023) 94 Cal.App.5th 47, 56.) However, under section 1172.6, subdivision (d)(3), the trial court may consider "stipulated evidence, and matters judicially noticed" in determining whether the prosecution has met their burden of proving the petitioner is not entitled to relief. In his briefing submitted to the trial court, Dominguez cited to facts from the probation report, including his age and criminal history, in support of his argument that he did not act with implied malice. Similarly, on appeal, Dominguez requested we take judicial notice of the probation report from his underlying jury trial. We granted his unopposed request and took judicial notice of the court's records in case numbers D077859 and D012153. Accordingly, because Dominguez was entitled to present additional evidence at the section 1172.6, subdivision (d)(3), hearing, and he relied on limited information from the probation report at the hearing, as well as in his briefing on appeal, we shall discuss the evidence he relies upon from the probation report.

as to when those alleged statements were reported to law enforcement" when evaluating the effect of the statements.

The prosecution argued the evidence established Dominguez was guilty of second degree murder because he was a direct aider and abettor "acting with implied malice at the very least, if not express malice." Among other facts, the prosecution emphasized evidence that the initial argument was between Mallory and Dominguez; Dominguez knew his companions were armed; Dominguez had "sway" over the first companion who tried to shoot because he stopped him from shooting and made him get back in the car; Dominguez "reengaged" with Mallory, asking him "Are you ready to finish this now"; and Dominguez gave the second armed companion "[t]he order to shoot." "If telling someone to shoot another person," the prosecutor argued, "is not acting with the knowledge that that act is dangerous to human life and showing a disregard, a conscious disregard for that danger, . . . what is?"

After taking the matter under submission, the trial court issued its decision to deny the petition through a written order, stating the following:

> "The trial record reflects that during the initial confrontation with the victim, his brother, and another male, [Dominguez] instructed the man holding a gun not to shoot, demonstrating his apparent authority over his companions. After telling the victim, 'I'll deal with you another day,' in the subsequent confrontation, [Dominguez] told his companion, 'Start shooting,' or 'shoot, go ahead shoot.' Regardless of the exact wording, the record is clear that [Dominguez] gave the order to shoot, that he knew that shooting at close range was dangerous to human life, and that he acted in conscious disregard for human life. In addition, he fled the scene with the shooter."

The trial court also addressed Dominguez's argument that his age should be considered in determining whether he harbored a conscious disregard for human life. It stated, "any shooting committed out of perceived disrespect is the result of perverse thinking. But here, [Dominguez's] conduct

8

reflects a clear understanding that shooting another human being is dangerous to human life, and [Dominguez] consciously disregarded that danger by ordering his companion to shoot."

Based on these findings, the court concluded it was "convinced beyond a reasonable doubt that [Dominguez] is guilty of second degree murder" and denied the petition.

## DISCUSSION

### I.

### *Standard of Review*

At an evidentiary hearing under section 1172.6, subdivision (e), "the superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder" under the amendments to the Penal Code made by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016.) On appeal, we review the trial court's factual findings at the section 1172.6 evidentiary hearing "for substantial evidence." (*Id.* at p. 1017; *Reyes, supra,* 14 Cal.5th at p. 988 ["Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence."].)

Under this standard, we review the whole record in the light most favorable to the judgment. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277 (*Ghobrial*).) "We must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125 (*Guiffreda*).) "We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision." (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 97 (*Didyavong*).)

Relying on *People v. Vivar* (2021) 11 Cal.5th 510, Dominguez urges us to independently review the record without deference to the trial court's findings because its findings were based solely on a "cold record." In *Vivar*, the California Supreme Court held, as a matter of first impression, the independent review standard applies to rulings on a motion to withdraw a plea due to adverse immigration consequences under section 1473.7. (*Vivar*, at pp. 524–528.) In doing so, the Supreme Court expressly limited its decision to the statute before it, section 1473.7. (*Vivar,* at p. 528, fn. 7 ["Our decision addresses only the independent standard of review under section 1473.7."].)

Several courts of appeal have declined to extend *Vivar's* application of de novo review of section 1473.7 proceedings to resentencing proceedings under section 1172.6. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 302; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Although Dominguez acknowledges the authorities against him, he contends they were wrongly decided. We reject this contention. As the *Clements* court reasoned, unlike proceedings under section 1473.7 which primarily involve questions of law, section 1172.6 often involves factual determinations. (*Clements,* at p. 301.) We thus review a trial court's ruling and its factual determinations for substantial evidence. (*Didyavong, supra,* 90 Cal.App.5th at pp. 93, 97; *Guiffreda, supra,* 87 Cal.App.5th at pp. 120–121, 125.)

II.

*The Trial Court Properly Denied Dominguez's Section 1172.6 Petition*

A.     *Principles on Aiding and Abetting an Implied Malice Murder*

"Murder is committed with implied malice when the killing is proximately caused by an act, the natural consequences of which are

10

dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (*Reyes, supra*, 14 Cal.5th at p. 988, internal quotation marks omitted.) "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." (*Ibid.*, internal quotation marks omitted.) "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must involve[ ] a high degree of probability that it will result in death." (*Id.* at p. 989, internal quotation marks omitted.)

A defendant may be held liable for second degree murder where he directly aids and abets an implied malice murder. (*Reyes*, *supra*, 14 Cal.5th at p. 990.) This remains a valid theory of murder liability after Senate Bill 1437's elimination of the natural and probable consequences liability for second degree murder. (*Ibid.*; see *People v. Gentile* (2020) 10 Cal.5th 830, 850.) Thus "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, at p. 850.)

"[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. . . . In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be

11

personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 (*Powell*), citation and fn. omitted; see *Reyes, supra*, 14 Cal.5th at pp. 990–991 [quoting *Powell*].)

B.    *Substantial Evidence Supports the Trial Court's Finding Dominguez Was Liable for Directly Aiding and Abetting an Implied Malice Murder*

Dominguez asserts the trial court erred because it misunderstood the legal requirements of aiding and abetting implied malice murder, and, alternatively, the evidence was insufficient to support the court's finding he was guilty under this theory. We are not persuaded.

As the California Supreme Court explained in *Reyes*, where, as here, the life-endangering act is a shooting, "implied malice murder requires attention to the aider and abettor's mental state concerning [the shooting] by the direct perpetrator." (*Reyes, supra*, 14 Cal.5th at p. 992.) This in turn requires the trial court to determine "whether [the aider and abettor] knew that [the shooter] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Ibid.*)

In *Reyes*, the trial court found the defendant guilty of aiding and abetting a fatal shooting with implied malice based on the *defendant's act of traveling to rival gang territory*, along with several other gang members, one of whom was armed, "and then considered whether *that act* was done with the mental state required for implied malice," namely whether the act of traveling to rival gang territory was dangerous to human life. (*Reyes, supra*, 14 Cal.5th at pp. 991–992, italics added.) The California Supreme Court held this was error because the trial court should have focused on the defendant's

12

knowledge and intent regarding the perpetrator's life-endangering act—that is, the shooting. (*Ibid.* ["implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim"].)

Dominguez contends the trial court here committed the same error as in *Reyes*. We disagree. In its written order, the trial court correctly set forth the elements of aiding and abetting an implied murder where the life-endangering act is a shooting, consistent with *Reyes*. The court expressly noted the People's theory that Dominguez is guilty of second degree murder as an aider and abettor who harbored implied malice required that Dominguez "had knowledge that the perpetrator intended to shoot, that he intended to aid the shooter in the commission of the shooting, that he knew the shooting was dangerous to human life, and that [he] acted in conscious disregard for human life." (See *Reyes*, *supra*, 14 Cal.5th at p. 992.) Unlike *Reyes*, the trial court here properly considered Dominguez's knowledge and intent *with regard to the shooting*, the perpetrator's life-endangering act, and focused on evidence that Dominguez knew the shooter was armed and gave the order to shoot.

We turn to Dominguez's contention there was insufficient evidence to support his guilt of aiding and abetting the fatal shooting with implied malice.

The evidence established that the initial altercation was between Dominguez and Mallory, during which Mallory made an offensive and derogatory comment to Dominguez. One of Dominguez's male companions then pointed a gun at Mallory and pulled the trigger. When the gun did not fire, the man racked the gun to prepare to shoot again. Dominguez stopped him by telling him, "Don't shoot, don't shoot without a reason," and pushed

13

him back in the car.  The man did as he was told.  Before returning to Garcia's car, Dominguez told Mallory he would "deal" with him another day.

Although it seemed the conflict had ended, Dominguez unilaterally reengaged with Mallory.  This time, Dominguez and another man got out of Garcia's car.  Dominguez told Mallory's group, "Yo vatos, do you want to finish that now?," inferably referring to the earlier altercation with Mallory.  Dominguez then immediately gave his companion the explicit order to shoot.  Only once Dominguez gave the order to shoot did the companion pull a gun out from under his jacket, take aim and fire seven to eight shots at Mallory's group, all while Dominguez stood next to him.  After Mallory collapsed from a gunshot wound to the chest, Dominguez fled with the shooter.

Reviewing the whole record in the light most favorable to the judgment (*Ghobrial*, *supra*, 5 Cal.5th at p. 277) and presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence (*Guiffreda*, *supra*, 87 Cal.App.5th at p. 125), we conclude substantial evidence in the record supports the trial court's determination that Dominguez directly aided and abetted an implied malice murder.

Dominguez does not dispute the evidence satisfies the actus reus required of the shooter.  Certainly the firing of a loaded gun at a human being is a life-endangering act that establishes the actus reus of the perpetrator.  (See *Reyes*, *supra*, 14 Cal.5th at p. 991 [for "implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act"]; *id.* at p. 989 [the perpetrator's act must not merely be dangerous to life in some vague or speculative sense; it must involve a high degree of probability that it will result in death].)  Although we agree with Dominguez the record does not establish the shots were fired at "close range," but rather were fired from a distance of 40 to 50 feet, the distance at which the gun was

14

fired does not mean the shooting did not pose a high probability of death. Rather, witnesses to the shooting testified that upon receiving Dominguez's order to shoot, the perpetrator extended his arm in front of his body and pointed the gun straight at Mallory and his group as he fired approximately seven shots directly towards them. And as Dominguez's counsel conceded at the evidentiary hearing, if Dominguez gave the order to shoot, "[h]e would be facilitating or aiding in the commission" of the shooting. The trial court found Dominguez *did* give such an order and thus, by his words and conduct, facilitated or aided in the commission of the shooting. Substantial evidence supports the trial court's findings that constitute the actus reus required of Dominguez for liability as an aider and abettor. (See *id.* at p. 991 [to be liable for an implied malice murder, Dominguez must "*by words or conduct*" aid in the commission of the shooting, (italics added)].)

Dominguez argues the evidence failed to establish he personally harbored implied malice, specifically that he was aware of and consciously disregarded the danger to life posed by the perpetrator's act. Dominguez points to the fact he disputed at the evidentiary hearing that he told the shooter to shoot and witness testimony on that fact was unreliable." Rather, the evidence, his youth, and the fact he has not previously been involved in a homicide suggests he "may well have intended to injure or frighten" Mallory.[4]

---

[4] In support of this argument, Dominguez cites to *In re Ferrell* (2023) 14 Cal.5th 593, 607 (*Ferrell*), in which the Supreme Court acknowledged a defendant may shoot a firearm with the intent to frighten, rather than to kill, which could negate a finding of malice. *Ferrell* is factually distinguishable. Unlike here, in *Ferrell*, there was evidence the shooter shot a firearm into the air in order to break up a fight. (*Ferrell,* at p. 598.)

We can reject all of these contentions because they are no more than an invitation for us to reweigh the evidence, which we may not do under substantial evidence review. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1090 ["Under a substantial evidence review, however, we do not reweigh the evidence."].) Rather, we must affirm the superior court's order if supported by substantial evidence, even if "there is also substantial evidence to support a contrary conclusion." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1165–1166.)

We note, however, a reasonable factfinder could infer from the testimony of multiple witnesses who heard Dominguez explicitly and directly order the shooter to "[*s*]*tart* shooting" or "go ahead [and] shoot" is not an order to shoot only once. (Italics added.) And that Dominguez remained next to the shooter and only fled with the shooter once all seven to eight shots were fired also support the reasonable inference he did not intend his order be understood as an order to shoot only once. Moreover, a reasonable factfinder could also infer from Dominguez's ominous threat to Mallory that he would "deal" with him later and his invitation to "finish" the dispute moments before he gave the gunman the order to start shooting that Dominguez intended to do more than frighten Mallory and his group. Finally, intent to kill is not a required element of implied malice, of either the perpetrator or direct aider and abettor to second degree murder. (See *Powell*, *supra*, 63 Cal.App.5th at pp. 711–712 ["there is no authority for the proposition that an aider and abettor of second degree implied malice murder must intend to kill" and "[i]t is, of course, well[ ]settled that a direct perpetrator can be guilty of murder based on implied malice—a theory that does not require an intent to kill"].)

We also disagree with Dominguez's assertion the trial court erroneously failed to consider evidence of his youth in ruling on the petition. Dominguez was 24 years old at the time of the charged offenses. He contends his youthful background "with no apparent prior involvement in or exposure to a homicide" is evidence "he may not have actually appreciated the risk of death."

In *People v. Pittman* (2023) 96 Cal.App.5th 400, 404 (*Pittman*), the Court of Appeal considered the effect of the trial court's failure to consider evidence of the defendant's youth[5] when ruling on his section 1172.6 petition for resentencing. The *Pittman* court held, "youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability." (*Id.* at p. 417.) Thus, the trial court was required to consider evidence of the defendant's youth when evaluating his mental state, including the element of conscious disregard for human life in the context of implied malice. (*Ibid.*) The court in *Pittman* concluded remand was appropriate because there was no discussion of the defendant's youth in the trial court's "otherwise comprehensive ruling" denying the petition. (*Ibid.*)

Here, unlike *Pittman*, the record includes a discussion of Dominguez's youth by both Dominguez's counsel and the trial court. In his briefing submitted to the trial court for the evidentiary hearing, Dominguez emphasized his youth at the time of the offense, as well as aspects of his background that he purported minimized his culpability. Dominguez expressly asked the court to consider his "age when evaluating his conduct." (Capitalization and boldface omitted.) At the evidentiary hearing, the court

---

5      For the purpose of evaluating the requisite mental state for murder, "youth" is defined as "being 25 years of age and younger." (*Pittman, supra,* 96 Cal.App.5th at p. 416.)

17

asked Dominguez's counsel about the authority cited in support of their argument regarding the effect of Dominguez's youth on his culpability for the offense and specifically referenced the authority in its order denying the petition. The court did consider Dominguez's argument that his youthful background in evaluating implied malice. But it rejected the argument, in favor of other evidence it found more compelling, which it was entitled to do.

We find no error in the court's consideration of the evidence on Dominguez's assertedly youthful background. The court expressly found Dominguez understood and consciously disregarded the danger to human life posed by shooting another person. Dominguez's behavior throughout the incident, including the control he exercised over his companions, provided sufficient evidence to support the court's finding he harbored the mens rea for murder, notwithstanding his age at the time of the offense. Further, as Dominguez acknowledges in his briefing on appeal, he was no stranger to the power and dangerousness of firearms at the time of offense.

In a discussion of his prior criminal convictions, Dominguez concedes he committed "two violent offenses [that] were potentially dangerous to human life," both of which involved the use of a firearm. At the age of 16, either Dominguez or his companion fired a shotgun towards a group of minor girls on school grounds. At the age of 19, Dominguez attempted to rob a cabdriver at gunpoint; the cabdriver was shot in the leg when he grabbed the gun from Dominguez and pushed it towards the floor. Although Dominguez argues these experiences demonstrate he may not have actually appreciated that a shooting involved the risk of death, a reasonable factfinder could draw the very opposite inference.

To satisfy the mens rea required of Dominguez as an aider and abettor to an implied malice murder, the evidence must establish he knew the

18

perpetrator intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life. (*Reyes, supra*, 14 Cal.5th at p. 992; *Powell, supra*, 63 Cal.App.5th at p. 713.) Dominguez's knowledge and awareness of the perpetrator's intention to shoot at the victim is evident in his explicit order to the perpetrator to shoot at the victim. This is a far cry from *Reyes*, where the defendant merely bicycled into rival gang territory and "[t]here was no evidence that Reyes's acts precipitated or provoked the shooting." (*Reyes,* at p. 989.) The record provides substantial evidence to support the trial court's finding Dominguez harbored implied malice in aiding and abetting the fatal shooting.

DISPOSITION

The order denying the petition is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.

19