Filed 7/10/24  P. v. George CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIC N. GEORGE,<br><br>    Defendant and Appellant. | D081794<br><br><br><br>Super. Ct. No. CR127670) |

APPEAL from an order of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, James M. Toohey and Susan E. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 1992, a jury convicted Eric N. George of murder and attempted murder for his role in a shooting at a taco shop.  The jury found true a special circumstance that George "personally used a firearm, to wit, a pistol" and

that he personally inflicted great bodily injury on two victims named in the attempted murder charges. In 2022, George petitioned to vacate his murder conviction under Penal Code section 1170.95[1] (now section 1172.6), based on changes to the felony-murder rule and the natural and probable consequences doctrine made in Senate Bill No. 1437 (2017-2018 Reg. Sess.), effective January 1, 2019. After an evidentiary hearing, the court denied George's petition.

On appeal, George contends that the court erred in denying his petition because the evidence did not establish that as an aider and abettor, he acted with the intent to kill, or with implied malice. We conclude there was substantial evidence to support the denial of George's petition. Thus, we affirm the order denying his section 1172.6 petition for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The 1992 Conviction and Direct Appeal*

We recite the facts as they appear in our unpublished decision on George's direct appeal (*People v. George* (June 23, 1994, D017524):[2]

> "Appellants George, Guillory and Johnson are members of the West Coast Crips street gang. On the evening of September 7, 1991, Johnson and his girlfriend were hosting a gathering at their apartment. George, Guillory and Guillory's girlfriend, Dierdre Jackson (Jackson), attended the party.
>
> "At about 1:30 a.m. the following day, Ephraim Puzon (Puzon) and Schultz stopped, with two young women, at the Cotija Taco Shop at Euclid and Imperial Avenues. Puzon was a member of

---

[1]     The Legislature renumbered section 1170.95 to section 1172.6 with no substantive change in text. (Stats. 2022, ch. 58, § 10.) For the remainder of this opinion we will refer to the statute by its current number only. All further unspecified statutory references are to the Penal Code.

[2]     This factual summary is included solely as background in order to provide context to the opinion.

the 'B-Down Boys,' a Bloods street gang. While Puzon and Schultz stood in line at the taco shop window, Puzon's red handkerchief, the Bloods color, was hanging out of his back pocket.

"At about the same time, Guillory and Jackson left Johnson's party and drove to the same taco shop in Jackson's car. Guillory was wearing a white tank top and blue pants. The Crips color is blue. Guillory stood by Puzon at the walk-up window and said, 'What's up, cuz?' Puzon responded, 'What's up, blood?'[2]

"Guillory pulled up his shirt, exposing some tattoos, and said, 'blood killers.' Puzon and Guillory began arguing, and Schultz and Jackson tried to calm them. Guillory opened the trunk of Jackson's car, but Jackson shut it. Jackson and Guillory then left, Guillory stating that he would be back.

"Jackson and Guillory returned to Johnson's apartment, and Jackson sat in the living room, while Guillory, George and Johnson talked among themselves on the patio. Then all four walked out to Jackson's car, and Guillory drove them to the taco shop.

"About that time, Marbury and James Green went to the taco shop, ordered some food and stood waiting while it was being prepared. Around the same time, Golson and his wife, Sandra, stopped at the taco shop after an evening of dancing at a local club. Golson walked up to the window to order food. The Golsons noticed Puzon and Schultz standing and eating near a car. Mrs. Golson then saw Jackson's car speed into the parking lot, park in back of the taco shop, and Guillory get out of the driver's side, carrying a long gun. The other two men then got out of the car, while Jackson stayed inside.

––––––––––––––––––––––––––––

"2     There was expert testimony at trial that the word 'cuz' is associated with the Crips gang and the word 'blood' is associated with the Blood gang. The expert testified that it is considered an insult for a Crips member to ask a Blood member, 'what's up cuz?'

"Guillory and one of the other men walked up to the taco shop. Puzon saw Guillory carrying what he thought was a sawed off shotgun or a bat. He ran across the street and jumped over fences to get away.[3] Schultz saw Guillory and Johnson and another man.[4] He heard Guillory say, "What's up, cuz?" He then heard someone say, "Who's fucking with my home boy?" Guillory then raised the gun and fired. Schultz took a few steps and was hit in the thigh by a bullet. 'He heard more shots, continued running down the street and banged on a door for help. He was taken to a hospital, where he underwent surgery and remained for five days.

"Golson heard gunfire and was shot in his stomach. He got up, ran, and was shot three more times. He ran out onto Imperial Avenue until the shooting stopped, then made his way back to his car and banged on the window. Mrs. Golson drove him to a hospital, where he underwent 10 hours of surgery. He spent over three weeks in the hospital. The surgeons were unable to remove a bullet which lodged in his chest.

"Green heard shots while he and Marbury were waiting for their food. They ran to the side of the building; Marbury tried to climb over a railing and Green fell to the ground. Green then saw a man who appeared to be carrying something; at the same time Green could hear shots coming from the other side of the shop.

_____

"3     Four days after the shooting, Puzon identified Guillory at a lineup and said he thought George resembled the man who had been with Guillory. At trial he testified that he had never seen George before and the man with the gun was not in the court room. Before trial, a man who looked like George had yelled at Puzon that he had better not testify, but Puzon said he was not afraid to testify. Puzon's father, however, testified that Puzon told him he was afraid to testify against the appellants.

"4     Schultz identified Guillory at a lineup four days after the shooting. He was unable to pick out Johnson from a lineup two weeks later, but he identified him during the preliminary hearing.

4

"After the shooting stopped, Green saw Marbury lying face down at the back of the shop. Marbury had been shot in the forehead and in the abdomen. He died of his wounds.

"When Jackson heard gunfire, she put her head down. When the shooting stopped, she looked up and saw George put what appeared to be a sawed-off shotgun into his jacket. Then she saw Guillory and Johnson walking from the taco shop. Guillory was carrying a silver gun. George and Johnson got into the backseat and Guillory told Jackson to move into the driver's seat. She drove them back to Johnson's apartment. Guillory and Jackson soon left, Jackson (at Guillory's bidding) carrying a gun out under her sweater. They drove to Guillory's mother's home and Guillory took the gun inside.

"Police Officer Wayne Spees heard a report of the incident, noted that a description of one of the suspects matched Guillory, and arrested him the following evening. George first denied being involved, but then admitted having gone to the taco shop in Jackson's car. He said he had remained next to the car during the gunfire and, when the shooting was over, had gotten back into the car and returned to Johnson's apartment with the others.

"Police found a rifle and a revolver at Johnson's apartment. Analysis of casings and a cartridge found at the taco shop showed that 12 of the casings had been fired from the rifle and a 13th could also have been fired from the rifle. A firearms expert was unable to determine whether the fragments taken from Golson's and Marbury's bodies were from the rifle."

The opinion further notes that in a statement to police, George admitted that he was present at the taco shop during the shooting but denied having a gun. He stated he "knew that guns were going to be involved [but] he had no fear of the gunfire because he knew no one would be shooting at him."

George and three codefendants were charged with one count of murder for the killing of Marbury, and two counts of premeditated attempted murder for the shootings of Golson and Schultz. The information alleged that George

personally used a pistol and personally caused great bodily injury to the two victims named in the attempted murder counts.

The case proceeded by jury trial in 1992.  The jury was instructed that it could find George guilty if the "murder or attempted murder was a natural and probable consequence of the commission of the crime of assault or assault with a firearm."

The jury found George guilty of first degree murder and two counts of premeditated attempted murder.  The jury also found true three allegations that George personally used a pistol.  The jury did not find that George caused great bodily injury to the two victims of attempted murder.  The trial court sentenced George to prison for 25 years to life.

On direct appeal, George made several arguments, including that the evidence was insufficient to support his murder conviction.  The Court of Appeal rejected this contention.  After discussing the facts adduced at trial, the court concluded, "[a]s the facts of this case sadly show, the deliberate killing of a person who was not the original target of revenge is the natural and probable consequence of a gang-related armed attack against rival gang members."[3]

In 2019, during a parole board hearing, George stated that on the morning of the shootings the following occurred:

> "Mr. [Guillory] and his girlfriend went to a—the taco shop to have something to eat, came back.  He [Guillory] had stated that he had had, uh, a confrontation with some Bloods up there, and, uh, we armed ourselves with weapons, went back to the, uh, taco shop, Deidre Jackson was the driver, and, uh, got to the taco shop, pulled in the parking lot, and I exited on the driver's side.  My other two codefendant—defendants exited on

---

[3]     Thus, on direct appeal, the sufficiency of the evidence as to the murder charge was evaluated under the now-discredited "natural and probable consequences" doctrine.

the passenger's side. One went up the west side, meaning Mr. [Guillory] went up the east side. As the individual approached us, like hey, hey, wait, wait, wait. Shots was fired. The first shot was Mr. [Guillory]. The second and third shots was mine, and I believe I hit Mr. Schultz. [T]he deceased was on the west side of the building, and I—I don't know who—who—who killed him, but I—I have to take responsibility for that because I'm in front of you now, you know, and I take full responsibility for, uh, any action that took place that night."

George admitted that at that time, "I was still part of—a major participant in the gangs."

B.    *Section 1172.6 Proceedings*

In 2022, George filed a petition for resentencing under Penal Code section 1172.6. The superior court appointed counsel for him and thereafter issued an order to show cause why relief should not be granted.

An evidentiary hearing took place on February 17, 2023. Neither party called any live witnesses. Instead, the parties offered the transcripts of George's trial, as well as a transcript of his parole hearing. Both parties agreed that it was codefendant Guillory who fired the shots that killed one victim and wounded the two other victims.

At the hearing, George argued the petition should be granted because the evidence was insufficient to establish beyond a reasonable doubt that George was the actual killer; or that he acted with the intent to kill in aiding or abetting the killing; or that he acted with reckless indifference to human life.

After hearing the arguments of counsel, the court denied the petition:

> "[PROSECUTOR]: [I]f he was assaulting people with that shotgun, that would be aiding and abetting Mr. Guillory's murder and attempted murders. That is the point of the case. Why bring a shotgun if you're there for a fist fight or you have no idea what is going to happen?
>
> "THE COURT: I agree. So petition for resentencing is denied."

7

A.    *General Legal Principles*

Senate Bill No. 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*People v. Gentile* (2020) 10 Cal.5th 830, 847 (*Gentile*); Stats. 2018, ch. 1015, § 1, subd. (f).)  To effectuate this purpose, "Senate Bill 1437 added three separate provisions to the Penal Code.  First, to amend the felony murder rule, Senate Bill 1437 added section 189, subdivision (e):  'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*Gentile,* at p. 842.)

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3):  'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Gentile, supra,* 10 Cal.5th at pp. 842–843.)

"Third, Senate Bill 1437 added section [1172.6] to provide a procedure for those convicted of felony murder or murder under the natural and

probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra,* 10 Cal.5th at p. 843.)

The section 1172.6 petition process "begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Ibid.*) If the petitioner "has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' (§ 1172.6, subd. (c).)" (*Strong,* at p. 708.)

Once an order to show cause has issued, the court must hold an evidentiary hearing to determine whether to vacate the murder conviction. (§1172.6, subd. (d)(1); see also *Strong, supra* 13 Cal.5th at p. 709.) At the evidentiary hearing, the burden is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by the changes to sections 188 and 189 by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

B. *Standard of Review*

At an evidentiary hearing under section 1172.6, subdivision (d)(3), "the superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder"

9

under the amendments to the Penal Code made by Senate Bill 1473. (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016.) "A trial court's factual findings at a section 1172.6, subdivision (d)(3), hearing are reviewed for substantial evidence. [Citations.] Under this standard, the record is reviewed ' " "in the light most favorable to the judgment' " ' and a reviewing court decides ' " 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] '[W]e look to whether the prosecution has introduced sufficient evidence of ' " 'reasonable, credible, and of solid value' " ' to "support a finding beyond a reasonable doubt" ' that petitioner was guilty." (*Henley,* at p. 1017.)

C.     *We Grant Respondent's Request for Judicial Notice*

Respondent requests that we take judicial notice of the reporter's transcript and the clerk's transcript contained within our case files for the direct appeal in *People v. George, supra,* D017524. We agree that the underlying records are necessary for the resolution of the instant appeal, and therefore we grant respondent's request.

D.     *The Trial Court Did Not Err in Considering the Transcript of George's 2019 Parole Hearing*

Appellant argues that the transcript of George's 2019 parole hearing is of negligible value, because "the parole process emphasizes admissions of responsibility" and George's generalized statements accepting responsibility were not probative of his mental state, particularly under current law.

At an evidentiary hearing pursuant to section 1172.6, a trial court may properly consider the transcript of a petitioner's parole hearing. (*People v. Myles* (2021) 69 Cal.App.5th 688, 703.) While it is true that George's generalized statements regarding his acceptance of responsibility do not necessarily answer questions about his specific mental state during the offense, George's descriptions of the events of the offense provide helpful context in assessing his mental state at the time. As to any limitations of the

10

testimony in the parole hearing transcript, "[t]he trial judge is ideally situated to determine whether the incentives at a specific parole hearing mesh with former section 1170.9's goal of aligning punishment with true culpability. When there are valid reasons to doubt the probity of a parole hearing statement, the trial judge can hear and appraise arguments in the case's context and accord the statement due weight." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 590.)

E. *Substantial Evidence Supports the Superior Court's Implicit Finding that George Aided and Abetted the Murder of Marbury*

The parties agree that George was not the actual killer of Marbury. However, an individual may be convicted of murder "either as a perpetrator or as an aider and abettor." (*In re Loza* (2018) 27 Cal.App.5th 797, 801.)

Here, George was convicted of aiding and abetting the first degree murder of Marbury. However, in assessing whether the prosecution has met its burden under section 1172.6, we note that it is not required to meet the standard for a conviction of first degree murder; instead, at this stage, the prosecution meets its burden if it can establish that George is liable for aiding and abetting a murder in any degree. This is because section 1172.6 provides no mechanism for reducing a conviction from first degree murder to second degree murder; instead, the trial court grants the petition if a conviction could be sustained under *any* theory of murder, and otherwise denies the petition. (*People v. Didyavong* (2023) 90 Cal.App.5th 85 (*Didyavong*).) Section 1172.6 does not provide a mechanism to reduce a first degree murder conviction to second degree murder—"[i]t treats all murder as a single, generic crime and requires resentencing when a defendant could not now be convicted of murder, generically." (*Didyavong*, at p. 96.)

In *Didyavong* as here, the defendant had been convicted of aiding and abetting a first degree murder. At the hearing on defendant's petition under section 1172.6, the trial court denied the petition, concluding that the

11

evidence was sufficient to establish that Didyavong was guilty of murder as an aider and abettor under an implied malice theory. It did not reach a conclusion as to first degree murder. Our court affirmed, noting that "if the Legislature intended to ensure that no defendant remains convicted of a crime greater than what he or she would be guilty of under the revised statutes, it is free to amend section 1172.6 to say so." (*Didyavong, supra,* 90 Cal.App.5th at p. 97.) Thus, in assessing whether the trial court erred in denying George's petition, we assess the evidence against the lowest standard of culpability, namely, aiding and abetting an implied malice murder.

"[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713.) Further, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Id.* at p. 714.) " 'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Here, the evidence amply supports an inference that by arming themselves and travelling to the taco shop for a gang confrontation, George knew Guillory was intending to engage in life-endangering conduct and he went with Guillory to assist him in the life-endangering act of opening fire at a public place, killing and injuring innocent members of the public who had the bad fortune to be caught in the one-sided shooting. The shootings were direct evidence of the conscious disregard for the lives of everyone present by Guillory and George.

George argues that "[t]here was no evidence appellant knew that Guillory's plan for the return to the taco shop included brandishing a firearm offensively, much less the commission of an unprovoked shooting, and therefore there was insufficient evidence of implied malice. George cites *People v. Reyes* (2023) 14 Cal.5th 981, 991–992 (*Reyes*), arguing that although a confrontation at the taco shop was likely when George travelled with Guillory to the taco shop, "the act of returning to the taco shop did not by itself give rise to a high probability that a death would result," and therefore, as in *Reyes*, the evidence was insufficient to support a finding of implied malice. In *Reyes*, the court concluded that the trial court's finding that " 'the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory' " fell short of a recognition "that implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the direct perpetrator's life endangering act." (*Reyes*, at p. 991, italics omitted.)

The facts here are substantially different than in *Reyes*. George did not simply travel to a taco shop with a fellow gang member who happened to be armed. Instead, after Guillory had a confrontation with a member of another gang, George and his co-defendants promptly armed themselves and returned to the scene of the confrontation, and the shootings occurred immediately upon their return. The evidence that George armed himself and returned with Guillory to the taco shop is sufficient circumstantial evidence that George knew that Guillory intended to engage in the life-endangering act of shooting people at the taco shop.

For these reasons, there is sufficient substantial evidence in the record to support the trial court's implicit conclusion that George acted with implied malice in aiding and abetting Marbury's murder.

Although George discusses facts that may suggest he was unaware that Guillory was armed or that Guillory intended to kill the victim, we must affirm the superior court's order if supported by substantial evidence even if "there is also substantial evidence to support a contrary conclusion." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1166–1167.) Drawing all inferences in favor of the superior court's order, as we must, we conclude the record contains substantial evidence that George directly aided and abetted the murder and attempted murders with the mental state required for implied malice murder. " 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Didyavong*, *supra*, 90 Cal.App.5th at p. 97, quoting *People v. Maury* (2003) 30 Cal.4th 342, 396.)

F.  *Substantial Evidence Supports the Superior Court's Implicit Finding that George Aided and Abetted the Attempted Murders of Schultz and Golson*

It appears that there is no dispute that George did not fire the bullets that struck Schultz[4] and Golson. However, an individual may be convicted of attempted murder "either as a perpetrator or as an aider and abettor." (*In re Loza, supra,* 27 Cal.App.5th at p. 801.) Here, George was convicted of aiding and abetting the premeditated attempted murders of Schultz and Golson.

Unlike the relevant mental state required for a conviction for aiding and abetting *murder* (i.e. implied malice), aiding and abetting *attempted* murder requires a higher standard, namely, a finding of express malice. Specifically, to establish that George is liable for aiding and abetting the attempted murders of Golson and Schultz, the court must find that the perpetrator (here, Guillory) acted with express malice (i.e. intended to kill)

---

[4]    We note that at the parole hearing, George stated that he believed he shot Schultz. The forensic evidence at trial did not support this statement.

14

and the aider and abettor (George) must have known the perpetrator's purpose and intent to facilitate it. Thus, both perpetrator and aider must act with express malice. (*People v. Lee* (2003) 31 Cal.4th 613, 624 ["to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill"].)

Here, as to Guillory, substantial evidence supports a finding that as the perpetrator, he harbored the intent to kill Schultz and Golson when he targeted them with his weapon and fired at them. Further, substantial evidence supports a finding that George knew that Guillory intended to kill rival gang members, and that George purposefully aided and facilitated Guillory in the crime. Specifically, by arming himself and joining Guillory in his immediate return to the taco shop to confront the rival gang members, and then joining in shooting at the victims, the only reasonable inference is that George went with Guillory to aid him in responding to the rival gang members by shooting them.

Because substantial evidence supports a finding that George acted with express malice when he aided Guillory in the attempted murders of Golson and Schultz, the court did not err in denying George's petition for resentencing under section 1172.6 as to the counts of conviction for attempted murder.

## DISPOSITION

The order denying the petition is affirmed.


                                                        KELETY, J.


WE CONCUR:



DATO, Acting P. J.



BUCHANAN, J.