Filed 8/7/25  In re K.F. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>K.F.,<br><br>　　　Defendant and Appellant. | A170960<br><br>(Alameda County<br> Super. Ct. No. JV-033644-13) |

K.F. admitted to robbery and the juvenile court committed him to a secure youth treatment facility (SYTF or secure track; Welf. & Inst. Code, § 875)[1] for a baseline term of confinement of three years.  K.F. contends the juvenile court abused its discretion in committing him to secure track because there is no substantial evidence demonstrating the commitment's probable benefit nor that a less restrictive, alternative disposition was unsuitable.  Additionally, K.F. argues the court abused its discretion in setting a three-year baseline term.  We affirm the commitment to secure

_____

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

track and we reverse the setting of a three-year baseline term. Accordingly, we remand to the juvenile court with directions to set the baseline term at two years.

# I. BACKGROUND[2]

## A. *Juvenile Wardship History*

By the time of the underlying offense in 2024, K.F. had a history with the juvenile justice system beginning in 2021 when he was 12 years old. In August 2021, K.F. admitted to second degree robbery (Pen. Code, § 211) and the juvenile court adjudged him a ward of the court and assigned him to the central supervision unit. In October 2021, he admitted to another second degree robbery (*ibid*.) and was placed in an out-of-home placement. In November 2021, he was placed with his grandmother as a resource family approval (RFA) home. In December 2021, K.F. admitted to receiving a stolen vehicle (*id*., § 496d, subd. (a)) and the court continued his out-of-home placement order.

In January 2022, K.F. was placed at Promesa, a short term residential therapeutic program (STRTP). There, he performed satisfactorily for one month but, in late February 2022, he left school grounds after being found with a vape pen on campus. He never returned and was deemed absent without leave (AWOL), which was the day after his parents had visited. A bench warrant was issued for his arrest. In April 2022, a subsequent petition was filed alleging K.F. had committed five offenses. In May 2022, he admitted to one count of second degree robbery (Pen. Code, § 211) and the juvenile court continued his placement order.

---

[2] We, like the parties, take the facts of K.F.'s wardship history and the underlying offense from probation's intake report and disposition report.

In August 2022, K.F. was placed at Boys Republic, an STRTP, where he did not make a positive adjustment. He appeared nonreceptive to treatment and was defiant, disrespectful, often under the influence, and refused to attend school. He received weekly counseling regarding his negative behaviors. He made a positive adjustment and was able to go on a trip to an amusement park and he had an on-campus visit with his parents. His positive behavior was short-lived and, as a final effort to encourage a change in his behavior, he was placed on a behavioral contract. After he violated the contract, a 14-day termination notice issued. In October 2022, he was returned to the Alameda County Juvenile Justice Center (JJC) on a change of placement.

In November 2022, K.F. was placed at Youth Homes, an STRTP in Contra Costa County. He left after eight days and a warrant was issued for his arrest. Shortly thereafter, in December 2022, he was arrested on multiple counts of robbery. In March 2023, he admitted second degree robbery.

In April 2023, K.F. was placed with his aunt in Stockton as an RFA home. He performed well while on GPS. After about five weeks, K.F. left his aunt's home and did not return. His aunt reported that K.F.'s parents were supposed to visit him in Stockton, but they did not show up. K.F. then asked to visit them in Oakland and his aunt told him it was not a good idea. K.F. left a few hours later. When K.F. did not return, his aunt reported that she suspected he was at his mother's house. She explained that K.F.'s parents condoned his negative behavior and did not provide structure. Recently, K.F. had become defiant when asked to do chores.

One month later, in June 2023, K.F. was arrested in San Leandro on two charges. He admitted to assault with great bodily injury (Pen. Code,

3

§ 245, subd. (a)(4)). At the disposition hearing in August 2023, the juvenile court gave him one more opportunity to live with his aunt as an RFA placement. At this time, the probation officer discussed secure track with K.F. and the importance of staying on the right path.

K.F. then returned to live with his aunt in Stockton. In early January 2024, K.F. again left his aunt's home to go to Oakland. He returned the next day and his aunt decided to give him another chance. The following day, he again left her home without permission and then returned. A week later, in mid-January 2024, K.F. left his aunt's home without permission and a warrant for his arrest was issued. He remained AWOL until he was arrested for the underlying offense in February 2024. It appears that during this time he was living with his parents.

## B. Current Offense

On February 9, 2024, in Oakland, three Black males wearing ski masks carjacked the owner of a green Honda CRV and took her Coach purse and fled in the vehicle. Two days later, the victim here was carjacked in his Toyota Camry. While he was sitting in his car in his parking garage, he was approached by two Black males wearing masks, one of whom carried a gun. They approached the victim's car from either side, one of the males held a gun to the window and, fearing for his life, the victim got out of his car, leaving his belongings in it, including his phone. The suspects got into the victim's car and drove out of the parking garage. After the victim tracked his car through his phone, a police officer found the car along with the victim's belongings, including a wallet and phone.

Dash camera footage from the victim's vehicle showed that after the carjacking, the victim's Camry caravaned with a second vehicle, the green Honda CRV from the earlier carjacking. After the Camry fled and then

4

parked at a different location where the officers found it, four suspects were visible walking around the car. K.F. drove the green Honda CRV. He was not one of the suspects who approached the victim in his car. When police officers searched K.F.'s parents' home in Oakland, they found, among other things, a gun which had previously been reported stolen as well as the Coach purse which had been stolen during the CRV carjacking.

In February 2024, a subsequent juvenile wardship petition (§ 602) was filed alleging that K.F., then 14 years old, had committed five felonies: first degree residential robbery (Pen. Code, § 211; count one), first degree residential burglary (*id*., § 459; count two), carjacking (*id*., § 215, subd. (a); count three), receiving a stolen motor vehicle (*id*., § 496d, subd. (a); count four), and possession of a firearm by a minor (*id*., § 29610; count five). The petition also included a special allegation that the offenses in counts one through three were committed while armed with a firearm (*id*., § 12022, subd. (a)(1)).

In May 2024, K.F. admitted to an amended count of second degree robbery (Pen. Code, § 211). The juvenile court dismissed the balance of the petition at the People's request.[3] The parties agreed the offense made K.F. eligible for secure track.

### C. Probation Report

A probation report submitted in advance of the disposition hearing recommended K.F. be committed to secure track. K.F. was assessed using the youth level of service/case management inventory to measure his risk for recidivism. His score of 27 placed him in the moderate risk category for

---

[3] In their briefs, both K.F. and the People state that K.F. admitted the firearm allegation. Our review of the record demonstrates that the parties' recitation of this fact is inaccurate. K.F. did not admit to the firearm allegation.

5

reoffending within the next year. His highest risk factors were education/employment, offenses/dispositions, and attitudes/orientation.

K.F. reported to probation that he had a close relationship with his parents but did not have a role model. While in custody he was participating in therapy five times a week and trying to help his peers. Regarding the offense, K.F. reported that he stayed in the car; he was not the one robbing people, but he felt sad for the victim. He realized that his choices were leading to the same outcomes. He did not want to go to secure track and hoped the court would allow him to be placed in an STRTP followed by living with his mother, or to be placed with his aunt. K.F. denied being in a gang, but probation noted that his co-participants were gang-involved. The report noted he was cooperative and remorseful.

K.F.'s mother reported that K.F. had suffered trauma from times when his family had been homeless and he had been sexually abused at school as a young child. His mother was open to family therapy. She explained that when K.F. was sent to an STRTP in Los Angeles, he was too young and it was too far away. She thought he was too young for secure track and wanted the court to allow him to reside in her home.

K.F.'s aunt—his most recent RFA placement—reported that K.F. had an unstable home life because both parents had drug issues. His parents covered for him and encouraged negative behavior. When K.F. resided with her, she held him accountable and enforced rules. His aunt believed an STRTP would not work because K.F. was a master manipulator. She advised that if K.F. was sent to a group home, his parents would pick him up like they did when he was at the STRTP in Fresno.

In considering out-of-home placement, the screening committee considered K.F.'s traumatic upbringing plagued by instability and neglect.

After a psychological evaluation was completed in 2021 it was recommended that he take medication for ADHD, but K.F. refused at the time. The report explained this was K.F.'s 19th referral with probation. He had been on probation since 2021 and had been tried on formal probation, three different STRTPs, and two RFA placements. He absconded from all his placements[4] and continued committing new, serious offenses. While in custody, K.F.'s behavior was poor. He was disrespectful and defiant towards staff. The report stated K.F. had rejected all services offered by probation and had been given ample opportunities to change his negative behavior. While he expressed remorse towards the victims, he continued to commit serious offenses and failed to realize the long-term trauma he was causing the victims.

The report stated that K.F. was "not a good candidate for Camp Sweeney based on his AWOL history." The committee determined the most suitable rehabilitative option was secure track. While at secure track, K.F. would "be enrolled in school, participate in anger management, individual therapy, mentorship program, and a new program called 'Choices,' to assist with changing one's behaviors." To be successful, he needed to learn to make the right choices and avoid associating with negative peers. The report explained, "While at Secure Track, the minor can focus on obtaining his high school diploma, therapeutic services to address past trauma, and participate in a mentorship program. Secure Track also offers pro-social activities that he can earn based on good behavior." Because it was local, his family would

---

[4] The probation report states that K.F. had "absconded from all his placements." However, based on K.F.'s wardship history summarized in the probation report, K.F. had absconded from his two RFA placements and two of the STRTPs. He was removed from the other STRTP after violating a behavioral contract.

be able to support him.  Also, "they can participate in family therapy to assist once he completes his time at Secure Track."

The probation report recommended a baseline term of two to three years.

## D. Other Submissions

K.F. submitted a disposition brief requesting a less restrictive placement at an STRTP or Camp Sweeney.  He argued, in pertinent part, that a secure track commitment was inappropriate given his young age.  Additionally, he argued a less restrictive disposition could meet the goals of both his rehabilitation and public safety.  He explained that while he had a prior AWOL history, he was very young the last time he was placed at STRTPs.  He argued camp could provide needed structure and therapy and allow visits with his parents, which would mitigate AWOL concerns.  If the court placed him in secure track, K.F. requested the baseline term be set at the lowest term of the range for his offense—two years—given his limited participation in the crime and his age.

K.F.'s social worker, who had worked with him since 2022, submitted an assessment.  The social worker explained that from a young age K.F. had faced significant traumatic events, including bouts of poverty, homelessness, the loss of family and friends due to community violence, familial criminality, medical trauma from his father's stroke, and inconsistent parental care.  He had unsupervised time in the community and relationships with negative peer groups, and he grew up trying to take care of himself.  K.F. had explained he started getting into trouble when he was 11 after his father's stroke.

The social worker advised that during the four months of K.F.'s detention, he presented "positive development in his maturity."  There had

8

been an increase in meaningful conversations around his behavior, exhibiting self-awareness, labeling and processing emotions, and managing conflict. K.F. had made strides to implement coping strategies such as taking space and engaging in physical activity to reduce stress and frustration. There were instances during his current detention where he was able to manage his emotions and disengage from situations which could have led to altercations. His attitude towards talk therapy had changed significantly based on his therapeutic work with the guidance clinic, and he stated that he would like to continue therapy if he could talk to someone outside of JJC. His therapist reported seeing a positive shift in K.F.'s mindset since he came into custody. He was more future-oriented and reflective, presenting awareness and insight regarding his actions.

The social worker reported that K.F. had originally expressed ambivalence on engaging with programs in the unit, but he tried the programming and had come to enjoy engaging with service providers, such as Rite of Passage, Restorative Justice for Oakland Youth (RJOY), and the Guidance Clinic. He was interested in continuing to engage with similar programs, such as talk therapy and mentorship programming, outside of JJC.

K.F. also submitted support letters from two service providers—Rites of Passage and RJOY. They explained that K.F. had been engaged in their programs and they saw transformations in him, including his behavior and his interactions with his peers and staff. The Rites of Passage consultant stated K.F. demonstrated growth in his ability to communicate effectively and handle challenging situations with maturity. The RJOY manager stated K.F. understood the severity of his situation and took accountability for his actions, and he was able to go deeper with his feelings and be vulnerable about his life experiences. They believed K.F. had potential to continue

9

making positive strides and become a contributing member of the community.

## E. Disposition Hearing

The juvenile court held a disposition hearing in May 2024, shortly after K.F. turned 15. The court explained it had considered probation's disposition report, K.F.'s disposition brief, the social worker's assessment, and the two support letters, and it took judicial notice of all prior findings, orders, and judgments in the proceedings.

K.F.'s counsel requested a less restrictive alternative placement at camp. She argued a less restrictive alternative was appropriate based on K.F.'s young age, his minor involvement in the offense as a getaway driver or a lookout, and letters in his support demonstrating he had made improvements while he had been at JJC. She argued that while K.F. had an AWOL history, he had been placed in the prior group homes when he was young and he was now more mature and would be less likely to leave. The prosecutor recommended secure track. He acknowledged that K.F. had experienced significant trauma in his life and was "a victim himself." But he argued K.F. needed a higher degree of treatment because the current offense was serious; it was his 19th referral to probation and 13th wardship petition before he was 16 years old; less restrictive measures had been tried and failed—he was placed at three different STRTPs and two RFAs and he AWOL'd from all of them;[5] and while in custody K.F. had been disrespectful and defiant. The prosecutor agreed to the two-year baseline term requested by K.F.

K.F.'s aunt and grandmother asserted he needed therapy. The juvenile court agreed explaining, "[T]he question for me is what environment should

---

[5] See footnote 4, *ante.*

10

that therapy take place in. [¶] Camp is not a locked facility and he just has not earned it with this Court for me to believe that he wouldn't walk. If things got hard, he would walk. And there's nothing in this record or in his history . . . that would indicate to me that when things got hard, [he] wouldn't take off." The court explained it needed to "stabilize" the situation and provide "structure." The court stated that K.F. could earn his way to camp as a "stepdown."

For the purpose of disposition, the juvenile court stated it had "considered a number of factors, including the severity of the offense, including the youth's role in the offense, the youth's behavior, and the harm done to the victims, the youth's previous delinquent history, including the adequacy and success of previous attempts by the [j]uvenile [c]ourt to rehabilitate the youth; whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and secure needs of the youth; whether the goals of rehabilitation and community safety can be met by assigning the youth to an alternative, less[ ]restrictive disposition available to the Court." The court also considered, among other things, K.F.'s age, developmental maturity, and any special needs affecting the safety or suitability of committing him to an SYTF. The court found that a less restrictive disposition was unsuitable and it committed K.F. to secure track.

The permissible range for the baseline term of confinement was two to four years. The juvenile court stated it had considered the criteria set forth in California Rules of Court,[6] rule 5.806(b), which criteria, and accompanying factors, it listed out. The court set the baseline term at three years.

---

[6] Further references to rules are to the California Rules of Court.

11

## II. DISCUSSION

K.F. contends the juvenile court abused its discretion in committing him to secure track because there is no substantial evidence demonstrating the commitment's probable benefit nor that a less restrictive, alternative disposition was unsuitable. Additionally, he argues the court abused its discretion in setting a three-year baseline term of confinement.

### A. *Commitment to Secure Track*

#### 1. **Legal Principles and Standard of Review**

Juvenile law provides that removal may be necessary for a minor's "welfare or for the safety and protection of the public." (§ 202, subd. (a).) Delinquent minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter." (*Id.*, subd. (b).)

Until recently, the Division of Juvenile Justice (DJJ) was "the state's most restrictive placement for its most severe juvenile offenders." (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902 (*Miguel C.*).) In 2020, the Legislature passed juvenile justice realignment through Senate Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337), which required the closure of DJJ and the transfer of its responsibilities to counties (§ 736.5, subds. (a), (e)). The stated purpose of these changes is " '[t]o ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment.' " (*Miguel C.*, at p. 907.) While these changes do not change section 202, "which recognizes punishment as a potential rehabilitative tool, the new scheme implicitly places less weight on

12

punishment by prioritizing treatment and restricting commitment avenues." (*Miguel C.*, at p. 907.)

"Section 875 . . . governs the commitment of juvenile wards to the [SYTFs] that have replaced the [DJJ] as the most restrictive placement alternative." (*In re Tony R.* (2023) 98 Cal.App.5th 395, 406.) The statute authorizes SYTF placement only if, among other findings, "[t]he court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(3).) In making this determination, the court must consider "all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case." (*Ibid.*) Additionally, the court must make its determination based on all of the following criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (*Id.*, subd. (a)(3)(A)–(E).) A decision to commit a minor must be supported by

13

evidence of probable benefit to the minor, as well as evidence that less restrictive alternatives would be ineffective or inappropriate. (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 6 (*Carlos J.*) [evidence of probable benefit is required by §§ 734 & 202]; see §§ 202, subd. (b), 734.)[7]

We review a juvenile court's placement decision for abuse of discretion. (*Miguel C.*, *supra*, 69 Cal.App.5th at p. 908.) An abuse of discretion occurs when the court's factual findings critical to its decision find no support in the evidence. (*Ibid.*) The appellate court therefore considers whether substantial evidence—meaning evidence reasonable in nature, credible, and of solid value—supports the juvenile court's commitment order in light of the purpose of the juvenile court law. (*Ibid.*; see § 202, subd. (b) [a minor "in need of protective services shall receive care, treatment, and guidance consistent

---

[7] The People argue *Carlos J.* does not apply because "it pertains to a DJJ commitment, not a commitment to a [SYTF] pursuant to section 875." Specifically, the People take issue with the fact that the "probable benefit" language of section 734 is absent from section 875. We find this to be a distinction without a real difference. "Evidence of probable benefit is required not only by section 734, but also by the language of section 202, subdivision (b) mandating that delinquent minors 'receive care, treatment, and guidance that is consistent with their best interest . . . and that is appropriate for their circumstances.' " (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 6; see § 202, subd. (b).) In essence, the "probable benefit" standard of section 734 was derived from section 202. Although wards are no longer committed to DJJ (see § 736.5, subd. (b)), section 875 still requires that the court consider as one of five criteria "[w]hether the programming, treatment, and education offered and provided in a[n] [SYTF] is appropriate to meet the treatment . . . needs of the ward." (§ 875, subd. (a)(3)(C).) Therefore, the juvenile justice realignment did not alter section 202 or abandon its general purposes and standards when section 875 was enacted. While *Carlos J.* can be distinguished from our case for other reasons, as stated below, we agree with K.F. on this point that *Carlos J.*, and cases alike, that analyzed the probable benefit of a commitment to DJJ, remain applicable in determining the appropriateness of SYTF commitments.

14

with their best interest and the best interest of the public"].)  We must indulge all reasonable inferences to support the juvenile court's decision.  (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080.)

## 2. Probable Benefit

K.F. first argues that there is no substantial evidence supporting a finding that committing him to secure track would benefit him.  Specifically, he contends there is insufficient evidence that the programming and treatment at secure track meet his needs.  (See § 875, subd. (a)(3)(C) [court must consider "[w]hether the programming, treatment, and education offered and provided in a[n] [SYTF] is appropriate to meet the treatment and security needs of the ward"].)

We conclude that substantial evidence in the record supports a finding that the programming and treatment at secure track is appropriate to meet K.F.'s treatment and security needs.  The juvenile court reviewed probation's disposition report.  The report acknowledged K.F.'s age,[8] ADHD diagnosis, history of trauma, and limited schooling.  The report explained, "While at Secure Track [K.F.] will be enrolled in school, participate in anger management, individual therapy, mentorship program, and a new program called 'Choices,' to assist with changing one's behaviors."  Probation reasoned that secure track was "the most suitable rehabilitative option" because K.F. "need[ed] to learn to make the right choices and avoid associating with negative peers in order to be successful.  While at Secure Track, [K.F.] can focus on obtaining his high school diploma, therapeutic services to address past trauma, and participate in a mentorship program.  Secure Track also offers pro-social activities that he can earn based on good behavior."

---

[8]  A juvenile court may only commit a minor to an SYTF if they are 14 years old or older.  (§ 875, subd. (a).)

15

Therefore, the disposition report identified programs and treatment at secure track which would be appropriate to meet K.F.'s needs, including building mentorships, having positive influences in his life, addressing his need to catch up on high school credits, and participating in individual therapy. As the court stated, it had considered "whether the programming, treatment, and education offered and provided in a[n] [SYTF] is appropriate to meet the treatment and secure needs of the youth" and it considered K.F.'s age.

*Carlos J.*, *supra*, 22 Cal.App.5th 1, relied on by K.F., is easily distinguishable because in that case, there was "*no* specific information in the record regarding the programs" in the most restrictive placement (*id.* at p. 4, italics added). Moreover, K.F. provided no evidence to dispute the availability or efficacy of the secure track programs. (See *id.* at p. 13.) In fact, the social worker's assessment and service providers' support letters demonstrate that K.F. had, in fact, benefitted from the programs and treatment he participated in while he had been detained in JJC prior to the disposition hearing.

K.F. also argues that committing him to secure track will likely harm him. We reject his contention.

K.F. argues that, at 15 years old, he is young for SYTF commitment and, given his age, "there is a high probability that [he] will suffer verbal and physical aggression at the secure track that will traumatize him and exacerbate his current behavioral issues." But he cites no evidence in the record supporting his assertion. By the plain language of the statute, a juvenile court may commit a minor who is at least 14 years old to an SYTF. (§ 875, subd. (a).) Merely observing that K.F. is on the younger side of the allowed age range for SYTF commitment is insufficient, by itself, to

16

demonstrate harm.  K.F. also argues that his mother stressed to the court at the disposition hearing that in secure track he would be placed with the peers with whom he was getting in trouble.  The record demonstrates, though, that the court considered his mother's concerns and explained that "[t]hose kids are at camp too."  K.F. has not, therefore, identified evidence in the record that placement in secure track will be harmful.

K.F.'s citation to articles and reports alleging the general dangers and disadvantages of incarceration for youth fares no better.  To the extent this evidence was not before the court, we decline to consider it.  (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 13, fn. 8.)  In any event, the disadvantages associated with incarceration for youth are precisely why section 875 was drafted to require consideration of various factors and an express finding that a less restrictive, alternative placement was not suitable prior to any such commitment.  (See *Miguel C.*, *supra*, 69 Cal.App.5th at p. 907 [goal of juvenile court law has shifted recently "toward primarily rehabilitative aims, with the Legislature in 2020 overhauling the juvenile court law through 'juvenile justice realignment' "]; Stats. 2020, ch. 337, § 1(a) ["[j]ustice-system involved youth who remain in their communities have lower recidivism rates and are more prepared for their transition back into the community"].)  Commitment to an SYTF, however, remains within the court's discretion if it finds that a less restrictive, alternative disposition is unsuitable.  (§ 875, subd. (a)(3).)

### 3. Less Restrictive Alternatives

Next, K.F. argues there was no substantial evidence demonstrating that less restrictive alternatives—specifically camp—were inappropriate.

The juvenile court could place K.F. in secure track only if it found "that a less restrictive, alternative disposition" was "unsuitable."  (§ 875, subd. (a)(3).)  In making this determination, the court was required to

17

consider the five criteria set forth in section 875, subdivision (a)(3)(A)–(E). At the disposition hearing, the court acknowledged its duty to consider a less restrictive alternative and expressly considered a placement at camp. The court clearly indicated it had considered all the criteria set forth in section 875, subdivision (a)(3), including the severity of the offense, including the youth's role in it; K.F.'s previous delinquent history, including the adequacy and success of previous attempts to rehabilitate him; whether the goals of rehabilitation and community safety could be met by assigning him to an alternative, less restrictive disposition; and his age and developmental maturity. The court had read the probation report and recommendation, as well as the social worker's assessment and letters of support.

K.F. acknowledges that his previous delinquent history, including the adequacy and success of previous attempts at rehabilitation (§ 875, subd. (a)(3)(B)), weighs in favor of the juvenile court's decision. The record demonstrates that for more than two years before K.F. committed the underlying offense, the juvenile court attempted less restrictive placements, which had failed. He was put on formal probation and placed at two RFAs and three STRTPs. He went AWOL from both RFAs and two of the three STRTPs. He was removed from the other STRTP after violating a behavioral contract. When he absconded from these placements, he continued to commit offenses. The disposition report stated that K.F. was "not a good candidate for Camp Sweeney based on his AWOL history." Probation, the social worker, K.F.'s family, and the court agreed K.F. would benefit from therapy. He also needed mentorship and schooling. Because he had not previously been in a secure facility, and therefore was able to leave, any attempts to treat these needs were unsuccessful. Therefore, evidence supports the court's finding that a less restrictive alternative was unsuitable, including because

18

"[c]amp [was] not a locked facility" and "nothing in this record or in [K.F.'s] history" demonstrated that "when things got hard, [he] wouldn't take off."

K.F. argues the court could not rely entirely on his history of AWOLing from placements to justify his commitment to secure track. Instead, he argues that the other criteria weigh in favor of being placed at a less restrictive setting. We disagree. Evidence in the record demonstrates that the programming, treatment, and education offered in secure track is appropriate to meet K.F.'s treatment and security needs, as discussed *ante*. (See § 875, subd. (a)(3)(C).)

K.F. contends that the goals of rehabilitation and community safety could be met by assigning him to an alternative, less restrictive setting. (See § 875, subd. (a)(3)(D).) He acknowledges the record demonstrates that during his three months in custody prior to the disposition hearing he had participated in programming at JJC and made progress. This weighs in favor of a secure track commitment, as previous rehabilitation efforts at open placements had failed and K.F. only began to make progress while in custody. K.F. does not point to any evidence in the record showing similar potential for rehabilitation at an open setting such as camp.

K.F. also argues the severity of the offense, including his role in it, does not warrant placement in secure track because second degree robbery is not severe compared to a violent offense and because he merely drove a getaway car. (See § 875, subd. (a)(3)(A).) The juvenile court considered this criterion and explained that a violation of Penal Code section 211 was "a serious and violent offense." Moreover, even if this criterion weighed against a secure track commitment, there is no demonstration that it should be weighed more heavily than any other criteria. Finally, the juvenile court considered K.F.'s

19

age and developmental maturity (see § 875, subd. (a)(3)(E)) and had reviewed, among other things, the social worker's assessment.

Essentially, K.F. asserts that the juvenile court relied "entirely" on his delinquent history—specifically his history of AWOLing from placements (§ 875, subd. (a)(3)(B))—and he contends that the finding of unsuitability should not be based on this criterion alone. But again, the record here reflects the court considered all relevant and material evidence presented and all criteria set out in section 875. Section 875 does not require the court to assign weight to any of the criterion in a specific manner; it only requires that the court consider all the criteria in making its determination. (§ 875, subd. (a)(3).) Thus, we reject K.F.'s suggestion that the court failed to consider all the criteria, misweighed the criteria, or should have weighed them differently. In conducting a review for substantial evidence, we do not reweigh the evidence. Further, even "if the evidence is such that rational people could reach conflicting conclusions, there is by definition substantial evidence to support the [decision]." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1166; see *In re Reynaldo R.* (1978) 86 Cal.App.3d 250, 256 [commitment was not an abuse of discretion even though minor's record justified a less restrictive disposition].)

In sum, we conclude that substantial evidence supports the juvenile court's finding that there was no suitable alternative that was less restrictive than secure track. Accordingly, we affirm the court's commitment decision.

**B. Baseline Term**

K.F. argues the juvenile court abused its discretion by setting the baseline term of confinement at three years.

### 1. Legal Principles and Standard of Review

When a juvenile court commits a minor to an SYTF, the court must set a baseline term of confinement. (*In re Jose R.* (2024) 102 Cal.App.5th 839, 846; § 875, subd. (b)(1).) The baseline term "is based on the most serious recent offense for which the ward has been adjudicated" and "represent[s] the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge." (§ 875, subd. (b)(1); see rule 5.806(b).) The baseline term must fall within the range set forth in rule 5.806(d). (§ 875, subds. (b)(1), (h).) For robbery, the range is two to four years. (Rule 5.806(d).)

Rule 5.806 lists four general criteria that juvenile courts must consider in selecting a baseline term "based on the individual facts and circumstances of the case . . . that is no longer than necessary to meet the developmental needs of the youth and to prepare the youth for discharge to a period of probation supervision in the community." (Rule 5.806(b).) These criteria are: (1) the circumstances and gravity of the commitment offense; (2) the youth's prior history in the juvenile justice system; (3) the confinement time considered reasonable and necessary to achieve the rehabilitation of the youth; and (4) the youth's developmental history. (Rule 5.806(b)(1)–(4).) Rule 5.806 also contains a nonexclusive list of relevant factors to be weighed when evaluating each criterion. (*Ibid.*) Under the rule, a court must "state on the record its reasons for selecting a particular term, referencing each of the criteria and any factors the court deemed relevant." (Rule 5.806(b).)

The Advisory Committee comment to rule 5.806 explains that a juvenile court should consider three primary goals as objectives when setting a baseline term: "positive youth development, public and community safety, and the establishment of flexible and fair commitment terms." (Advisory

21

Com. com., rule 5.806.)  The "persistent focus" is the "end goal of successful reentry into the community." (*Ibid*.)  "The flexibility inherent in the matrix is intended to result in a baseline term of commitment that is no longer than necessary to protect the public but is of sufficient length to assure the victim and the community that the harm committed can be redressed by the juvenile justice system in a developmentally appropriate manner." (*Ibid*.)  The comment explains that setting a baseline term requires an "individualized approach" which must be "based on the needs of the individual being committed." (*Ibid*.)

We review the juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences in support of the juvenile court's decision.  (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)  " ' "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." ' "  (*In re Oscar A.* (2013) 217 Cal.App.4th 750, 755.)  " 'A [juvenile] court [also] abuses its discretion when the factual findings critical to its decision find no support in the evidence.' "  (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.)

## 2. Analysis

As a threshold matter, the People argue that K.F. forfeited his challenge to the baseline term.  We agree as to one of K.F.'s arguments.  He first argues that the juvenile court "failed to specifically apply the factors set forth in rule 5.806" to his individual facts and circumstances.  He contends the court "did not cite to any single or multiple factors or facts" affecting its determination in setting the baseline term, and thus the court did not properly apply the rule 5.806 factors.  K.F. forfeited this contention by failing to object at the disposition hearing.

The forfeiture rule applies to claims raised for the first time on appeal "involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353.) K.F.'s challenge falls squarely within the categories of appellate challenges *Scott* says must first be objected to in the lower court: the "stated reasons allegedly do not apply to the particular case" or the court erred because it "misweighed the various factors" or "failed to state any reasons or give a sufficient number of valid reasons." (*Ibid.*) Assuming for argument that the juvenile court did, in fact, fail to specifically apply the rule 5.806 criteria to K.F.'s facts and circumstances, a timely objection would have permitted the court to fix any asserted error. That K.F. had clearly requested the court set a two-year baseline term and the court disagreed with his request does not save his challenge. An objection does not merely allow the court to change the result; it may, instead, permit the judge to clarify his or her reasoning in making a decision. (See *Scott*, at p. 351.)

K.F. makes an additional challenge, though, to the baseline term, arguing that substantial evidence does not support the finding that the baseline term should be three years. He contends that instead, considering the rule 5.806 criteria, the baseline term should be two years. The People acknowledge that K.F. makes this argument and they do not contend that his claim is forfeited. We therefore address K.F.'s substantial evidence challenge.

We conclude the juvenile court abused its discretion in setting the baseline term at three years because the decision is not supported by substantial evidence. Probation's disposition report recommended a baseline of two-to-three years. The report did not analyze the rule 5.806(b) criteria. In his disposition brief and at the hearing, K.F. requested a two-year baseline

term given his age and limited participation in the crime.  The prosecutor agreed to K.F.'s request for two years based on his age and mitigating circumstances.  The court listed out the four criteria set forth in rule 5.806(b), and for each criterion it listed out the factors that may be considered as stated in the rule.  The court stated it had considered these criteria and accompanying factors, however it did not discuss any specifics related to K.F., his delinquent history, or the underlying offense.  Despite the prosecutor's agreement to a two-year baseline term, the court set the baseline term at three years.  This was an abuse of discretion.

K.F.'s involvement in the offense was limited.  His co-participants walked up to the victim's car, stood on either side of it, pointed a gun at the victim, and entered the car after the victim got out.  K.F. drove a separate vehicle which served as a getaway car for one of the assailants and which caravaned with the stolen vehicle.  While we do not discount the seriousness of an armed carjacking nor any trauma inflicted on the victim, K.F. did not approach the victim or his vehicle and the victim was not physically harmed.  (See rule 5.806(b)(1).)

K.F. had a lengthy history in the juvenile justice system and had been placed out of his home multiple times.  Prior rehabilitation efforts were unsuccessful.  However, K.F.'s upbringing, family issues, and childhood trauma played a large role in his delinquent history.  (See rule 5.806(b)(2), (4)(D).)  Further, K.F. was only 14 years old at the time of the offense and had just turned 15 at the time of the disposition order.  (See rule 5.806(b)(4)(A).)

No evidence was presented to the juvenile court estimating the reasonable length of time necessary to rehabilitate K.F.  That is, in neither the disposition report nor elsewhere in the record was it recommended that

three years was necessary. In the mere three months that K.F. had been in custody at JJC prior to the disposition hearing, he had already made progress, which he acknowledges in his opening brief. The record demonstrates that when provided suitable treatment and programs— including therapy, mentorship, and education—in a structured, secure environment, it was reasonably likely he could be prepared for discharge at the lower baseline term. Additionally, the record shows that once released from commitment there were programs in the community to assist K.F. with continuing his progress. (See rule 5.806(b)(3)(E).)

We cannot find substantial evidence in the record to support a conclusion that a three-year baseline term of confinement is "no longer than necessary to meet the developmental needs of the youth and to prepare the youth for discharge to a period of probation supervision in the community."[9] (Rule 5.806(b); § 875, subd. (b)(1).) The juvenile court's decision was arbitrary and lacking in factual support and, therefore, the court abused its discretion in setting the baseline term.

## III.   DISPOSITION

The disposition order is reversed insofar as it set the baseline term of confinement at three years. The matter is remanded to the juvenile court and the court is directed to issue a new order setting the baseline term at two years. In all other respects, the disposition order is affirmed.

---

[9] We observe that while the People contend the juvenile court properly *considered* the rule 5.806 criteria, they set forth no argument for *what substantial evidence* supports the three-year baseline term.

_____
Langhorne Wilson, J.

We concur:


_____
Humes, P. J.


_____
Banke, J.


A170960, In re K.F.

26